MELVIN J. McBRIDE, PLAINTIFF, v. CITY OF ATLANTIC CITY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.

Superior Court of New Jersey
Law Division

Decided November 19, 1974.

*Mr. Stephan Hankin* for plaintiff.

*Mr. Murray Fredericks* for defendant.

HORN, A. J. S. C. This action in lieu of prerogative writs has as its objective either the securing of a departmental hearing for plaintiff as a policeman, pursuant to *N. J. S. A.* 40A:14–147, or a judicial declaration that a resignation submitted by him was invalid because it was the result of coercion.

Plaintiff was a patrolman with the Atlantic City Police Department for approximately four years prior to January 17, 1974. On that date he and Officer Phillips, his radio car partner, went to an unoccupied building during daylight hours to remove copper wire installed as part of the electrical system in order to sell same to a junkyard and thereby obtain extra money. Both men were in civilian garb. Phillips had with him a police radio tuned into police department calls. He had formerly been a member of the major crime squad and as such been entitled to have the radio with him at all times. However, not being a member of the squad on January 17, 1974, he had no authority to have the radio in his possession.

While plaintiff and Phillips were in the building and engaged in dismantling the copper wire someone reported to the police department that juveniles had broken into the building. Two radio-car policemen entered the building and questioned plaintiff and Phillips concerning their activities there. Phillips told them they had the owner's permission to take the wire.

The police were somewhat skeptical about the truth of this explanation. As a result they immediately reported the

incident to their street sergeant, who in turn caused a report to be made to the deputy commissioner of public safety who, with the commissioner, was charged with the supervision of the police department.

At the direction of the deputy commissioner plaintiff and Phillips were told to meet with him later in the evening. They arrived at his office between 6:30 and 7:00 P.M. that same evening, January 17, 1974.

The deputy commissioner instructed plaintiff and Phillips to make reports as to what had occurred concerning the afternoon entry into the premises. A tape recorder was in operation during the conversation. Plaintiff's statement was later typewritten and signed by him. He was asked to submit to a urinalysis and his arms were checked for needle marks, none of which were found. The deputy commissioner advised him that he was suspended and to return the following day at 11 A.M. He was obliged to turn in his gun, badge and night stick. While doing so he asked Sergeant White, to whom the incident was reported by the investigating police officers that afternoon and who was present at the evening meeting, why his paraphernalia was taken from him and why he was suspended. Sergeant White told him that he was in a lot of trouble and that he had better return on the following day as directed.

Unfortunately, the recording was not complete, due to a breakdown in the recording device. It is obvious, however, that he had been questioned concerning his role in removing the copper wire and the fact that he obtained $17 from the sale of it to a junk dealer after he and Phillips had burned off the insulation.

The next day he, along with Phillips, reported as directed to the office of the commissioner of public safety. Present were Commissioner Floriani, Deputy Commissioner Ordille and Police Sergeants White, Nelson and Rifice.

Floriani told them that he had met with the prosecutor and the prosecutor was willing to drop criminal charges against them if both plaintiff and Phillips resigned. He

therefore was offering them the choice of resigning for personal reasons or meeting criminal charges that would be filed against them. The commissioner suggested that they take time to think about it.

They went into an adjoining room, asking Sergeant White, in whom they apparently had some confidence, to discuss the matter with them. The discussion centered about what would happen if they refused to sign resignations and whether, if they did sign the resignations, criminal charges could still be lodged against them. Floriani had also stated that if they resigned for personal reasons they could be considered for reinstatement in about two years if "they kept their noses clean." Plaintiff allegedly could not understand why the incident warranted such drastic consequences.

After discussions Phillips decided to sign the resignation. Plaintiff then decided to do likewise. The typewritten form signed by plaintiff is dated January 18, 1974 and states, "I am hereby resigning from my position of police officer, Atlantic City Police Department, Department of Public Safety, for personal reasons, effective January 18, 1974."

About a month later plaintiff consulted an attorney. The present action was instituted on March 29, 1974.

The record shows that on or about February 19, 1974 plaintiff, through his attorney, requested a hearing pursuant to *N. J. S. A.* 40A:14–147. The hearing was refused and an appeal to the Civil Service Commission was rejected.

Plaintiff may be entitled to a hearing under the above statute only if he is a member of the police department. *Andrews v. Lamb,* 136 *N. J. L.* 548, 551 (Sup. Ct. 1948). Accordingly, this court is obliged to determine whether the resignation was a valid one or whether it was the product of coercion. If the former, plaintiff is not entitled to a hearing since he is no longer a member of the police department. If the latter, then the court is obliged to declare the invalidity of the resignation and direct that plaintiff be restored to such rights as he might have had if no resignation had been submitted. The primary issue, therefore, is whether plain-

tiff's resignation was in fact obtained by defendant as the result of illegal means, *i. e.,* coercion or duress.

Obviously, the burden is upon plaintiff, who now seeks to avoid the effect of what appears on its face to be a valid resignation. *Prudential Ins. Co. of America v. Fidelity Union Trust Co.,* 128 *N. J. Eq.* 327 (E. & A. 1940) ; *Ewert v. Lichtman,* 141 *N. J. Eq.* 34 (Ch. 1947).

In *Rubenstein v. Rubenstein,* 20 *N. J.* 359 (1956), it was held that basic to the legal concept of duress, proceeding as it does from the unreality of the apparent consent, the controlling factor is the condition, at the time, of the mind of the person subjected to the alleged coercive measures, rather than the means by which the given state of mind was induced, and thus the test is essentially subjective.

The pressure must be wrongful, and not all pressure is wrongful. Means in themselves lawful must be so oppressively used as to constitute an abuse of legal remedies. The act or conduct complained of need not be "unlawful" in the technical sense of the term; it suffices if it is "wrongful in the sense that it is so oppresive under given circumstances as to constrain one to do what his free will would refuse." *Rubenstein v. Rubenstein, supra* at 367.

Moral compulsion or psychological pressure is enough if it subjugates the will and constrains one to do what his free will would refuse. *In re Blake's Will,* 21 *N. J.* 50, 66 (1956).

At first blush *Gobac v. Davis,* 62 *N. J. Super.* 148 (Law Div. 1960), appears to be parallel. In that case plaintiff, an inspector for the Division of Alcoholic Beverage Control, was faced with the charge of having improperly warned a target licensee of an investigation that was being conducted. The accusation against plaintiff in that case came about under the following circumstances. Plaintiff telephoned a deputy director of the Division of Alcoholic Beverage Control, requesting an interview to present certain complaints concerning working conditions at the office in which he was employed. An hour later he received a telegram from the

deputy director directing him to report two days later at the Newark office.

At the outset of the conference, for a period of about 15 minutes, plaintiff presented complaints concerning his working conditions and in particular those pertaining to his immediate district supervisor. The deputy director then stated it was a case of "mutual dissatisfaction" and that the director had received information which had led him to conclude that sufficient cause existed for the dismissal of plaintiff as an investigator. He further stated that he had been instructed by the director to have plaintiff come in and to offer him an opportunity to resign rather than to be dismissed. He was then informed that he had committed a most unpardonable sin, in that he had "blown the whistle" on an investigation by informing a licensee of an investigation being conducted by the Division, as a result of which it was aborted.

Plaintiff denied the charge and demanded information to identify that with which he was charged. More information was refused. He was merely informed that he had a choice of either resigning or being dismissed. The deputy director explained to him the benefits of submitting his resignation, namely, that the record would only show a resignation, no matter who inquired, while if he were dismissed the record would show the reasons for the dismissal and would have to be furnished to anyone who inquired, particularly prospective employers. Plaintiff asked what the record would show if he were dismissed. He was told that it would be in formal language consisting of "violation of oath of office, disrespect for superior officers, misconduct in office and possibly others they might work up as they analyzed it more carefully, but that the principal factor would be the tipoff of a certain licensee with respect to a certain investigation."

Plaintiff asked to see the director but that request was refused on the ground that the director had considered the information and evaluated it, he had come to an administrative determination and told the deputy director to pass the message on to plaintiff. Plaintiff then asked for time to con-

sider, stating that it was unfair for a man to consider the matter in such a short while, and was told that the deputy director had been instructed by the director to obtain plaintiff's decision, and that he would either have to resign "right now" before he left the office or be dismissed.

Further concern was exhibited by plaintiff as to the effect upon his family and his minor political office in his home town. In the course of the discussion the deputy director took from the drawer of his desk a typed letter of resignation which had been prepared two days before and proffered it to plaintiff. At the conclusion of the conference the plaintiff signed the resignation.

After he left the office he conferred with an attorney. Two days later his attorney sent a letter to the director, stating that the resignation was withdrawn and advising that plaintiff would report for whatever duties would be required of him. Correspondence ensued and plaintiff's attorney requested that a hearing be granted. This was denied.

Judge Collester determined from the foregoing that the resignation was the product of improper coercion; that plaintiff was never told he would have a right to a hearing before the director and an opportunity to offer a defense to any charges which might be made against him. The judge found that "plaintiff signed his letter of resignation only after duress was imposed upon him involving a wrongful act on the part of the defendant and inducing the plaintiff to sign such resignation under the influence of such fear as precluded him from exercising his free will and judgment." *Gobac v. Davis, supra* at 162.

■ On analysis, *Gobac* is distinguishable from the case at bar. In the instant case plaintiff was fully aware of the conduct that precipitated his suspension and the meetings with the deputy commissioner and the commissioner. Having been suspended from his duties the evening of January 17 and told he was in serious trouble, he certainly must have considered in the interval before the morning meeting the following day what might be the ultimate consequences. As

a police officer for almost four years he knew his legal rights as to hearing before discharge and also his rights under the criminal process, such as indictment and trial. Unlike *Gobac*, he was not suddenly faced with an accusation concerning which he had no knowledge even as to the time and place, so that he could consider all vital circumstances in making the decision.

It is true that plaintiff asserted his innocence, based on an alleged representation to him by Phillips that the latter had obtained the consent of the building owner. But as a mature person and an experienced policeman he must have likewise known that such defense was highly suspect. He must have realized that owners of buildings may salvage the valuable materials contained therein for themselves. He must also have considered that his acceptance of Phillips' uncorroborated assurance might alone, under all the circumstances, have constituted cause for investigation and penalty.

The modern rule in considering duress is that it is one of fact in the particular case, to be determined on consideration of the surrounding circumstances, such as age, sex, capacity, state of health, temperament, situation and relation of parties, and that duress may exist, whether or not the threat is sufficient to overcome the mind of a man of ordinary firmness or courage, it being sufficient to constitute duress that one party to the transaction is prevented from exercising his free will by reason of wrongful threats made by the other. 17 *C. J. S. Contracts* § 175 at 958–959.

Following the direction of the Supreme Court in *Rubenstein v. Rubenstein, supra,* remanding the cause for further proceedings, the issue of coercion with respect to plaintiff's execution of a deed was tried in the Chancery Division. In holding that there was no coercion, Judge Conford said:

* * * It has long been held in this jurisdiction that " 'a demand made under the urgency of an intimation that if not complied with the law will be appealed to cannot reasonably be claimed to be either extortion or duress,' " and that rule is applicable even if the sanction of the criminal law is the basis of the intimation

where there is in fact criminal liability. *Mullin v. Leamy*, 80 *N. J. L.* 484, 485 (Sup. Ct. 1911) ; *Frost v. Frost*, 42 *N. J. Eq.* 55 (Ch. 1886) ; *cf. Bodine v. Morgan*, 37 *N. J. Eq.* 426 (Ch. 1883) ; *Travis v. Unkart*, 89 *N. J. L.* 571, 573 (E. & A. 1916), where the result was otherwise because it was clear that the person claiming duress was not guilty of the offense in respect to which criminal prosecution was threatened. * * * [*Rubenstein v. Rubenstein*, 40 *N. J. Super.* 371, 389 (Ch. Div. 1956)]

The actions of defendant through its officers were bona fidely initiated. What flowed from plaintiff's deportment was not abnormal. His off-duty collaboration with Phillips in the salvaging operation was followed by what might be reasonably expected under the circumstances, to wit, criminal charges or other drastic consequences. His expressions of surprise at the result are not realistic.

█ Plaintiff has not intimated that the agreement to stifle the prosecution was unlawful. But even if he had, it would not serve his position. *Rubenstein v. Rubenstein, supra,* 40 *N. J. Super.,* at 390, also held that on the authority of *Slater v. Gittleman,* 104 *N. J. Eq.* 172 (E. & A. 1929), if the action of the parties constituted a compounding of a misdemeanor, they would be left where the court found them.

Apart from the legal aspects, I find that defendant did not subject plaintiff to the pressures of a decision which under our law were tantamount to coercion.

█ Plaintiff also contends that the resignation was invalid because he was not informed of his rights under *Miranda v. Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed.* 2d 694 (1966), and that he was not presented with "viable and constitutional alternatives" as required under *Garrity v. New Jersey,* 385 *U. S.* 493, 87 *S. Ct.* 616, 17 *L. Ed.* 2d 562 (1967).

Neither of these contentions is meritorious. *Miranda* warnings are not required to be given unless a custodial interrogation is being conducted. *State v. Graves,* 60 *N. J.* 441 (1972) ; *State v. Williams,* 59 *N. J.* 493 (1971). Such was not the case here.

*Garrity v. New Jersey, supra,* is inapplicable because plaintiff was not being asked to incriminate himself. He was asked to either resign or to stand charges of criminal conduct. He was not asked to confess; he was given the opportunity to avoid criminal charges if he desired. He was never threatened that his constitutional rights to defend against the charges would be denied him. I am not referred to any constitutional mandate that requires one who is asked to resign or stand charges must be warned of a right to a departmental hearing even if he is entitled to such if he refuses to resign.

Accordingly, judgment will be entered against plaintiff and in favor of defendant.