MAHONEY *v.* LINCOLN BRICK CO.

1. APPEAL AND ERROR—EVIDENCE—COMMISSIONS.

In action for commissions alleged to be due plaintiff for sale of defendant's brick and tile for use on State building projects, testimony clearly showed defendant employed plaintiff because of belief entertained that latter had political influence and connections which would enable it to sell such products to contractors on such projects.

2. CONTRACTS—POLITICAL INFLUENCE UPON STATE ARCHITECTS.

Contract as to commissions on sales by which the parties thereto proposed and intended plaintiff should, by political influence or coercion, affect the judgment or decision of architects supervising construction work on State building projects as to use of defendant's brick and tile is *contra bonos mores* and void.

3. SAME—PUBLIC POLICY.

The question whether a contract is against public policy depends upon its purpose and tendency, and not upon the fact that no harm results from it.

4. SAME—PUBLIC POLICY—INFLUENCE OF EXECUTIVE OFFICERS.

Any agreement entered into because of the actual or supposed influence which the employee has, engaging him to influence administrative or executive officers in the discharge of their duties, which contemplates the use of personal influence and personal solicitation rather than any appeal to the judgment of the officer on the merits of the object sought, is contrary to public policy and void.

5. APPEAL AND ERROR—NONJURY LAW CASE—WEIGHT OF EVIDENCE —CREDIBILITY OF WITNESSES.

In a law case tried without a jury, the trial court is the judge of the weight of the evidence and the credibility of the witnesses; so unless the findings are against the great weight of the evidence, the judgment is not disturbed on appeal.

Illegality of contract to procure public contracts, see 2 Restatement, Contracts, § 562.

Appeal from Superior Court of Grand Rapids; Taylor (Thaddeus B.), J. Submitted January 13, 1943. (Docket No. 2, Calendar No. 42,154.) Decided April 6, 1943.

Assumpsit by Edward J. Mahoney against Lincoln Brick Company, a Michigan corporation, for commissions on the sale of brick. Judgment for defendant. Plaintiff appeals. Affirmed.

*Linsey, Shivel, Phelps & Vander Wal,* for plaintiff.

*Warner, Norcross & Judd* and *Joseph Shulsky,* for defendant.

Boyles, C. J. Plaintiff appeals from a judgment for defendant, entered by the trial court sitting without a jury.

In April, 1940, plaintiff began the present suit to recover alleged selling commissions claimed to be due him under an oral contract with defendant. In his declaration plaintiff alleged in substance that he was employed by defendant, to sell brick and tile for use in the construction of certain State buildings and that defendant agreed to pay him a selling commission of $2 per thousand on brick and six per cent. on the price of tile sold, that through his efforts defendant sold large amounts of brick and tile, and that defendant refused to pay him for his services.

Defendant admitted that it had made an agreement with plaintiff, but disputed the rate and amount of commission claimed and denied liability for any further amount. As an affirmative defense, defendant claimed that its contract arrangement with plaintiff was void and unenforceable because

against public policy. In its answer defendant stated in part:

"The agreements between plaintiff and defendant were against public policy and illegal and void, because they were bargains for personal, political, oppressive, coercive and other improper influences to be exercised by plaintiff over and upon officers of the government of the State of Michigan and architects and contractors employed by and dealing with the State of Michigan for the purpose of having orders for brick and tile awarded to defendant, and therefore plaintiff is not entitled to recover in this action."

In his opinion determining the contract between plaintiff and defendant to be void and unenforceable because against public policy, the trial court said in part:

"From the testimony, the court finds that plaintiff was to receive $2 commission on brick, and 6 per cent. on glazed tile, only.    *    *    *

"Defendant, however, has interposed another defense, namely that the contract was void because it was against public policy in that it was based upon the political influence to be used by the plaintiff with the State-employed architects. This is the controlling question of the case. Was the plaintiff employed because of his political connections and supposed influence, or was it because of his experience as a brick salesman and his knowledge of the products that he was about to dispose of.    *    *    *

"We conclude that plaintiff was employed and the contract consummated because of the plaintiff's supposed or known political connections and influence. It was completely surrounded with political implications and suggestions from its very inception and being so conceived, we must declare the contract unenforceable."

Judgment was entered for defendant, and plaintiff appeals, contending that the trial court erred in determining the contract to be void as against public policy.

The record shows that in 1938 the State of Michigan was engaged in an extensive building program in connection with certain public institutions, including the Ionia State hospital, Traverse City State hospital, Kalamazoo State hospital,' Wahjamega State hospital for epileptics, and Mt. Pleasant home and training school. The State had entered into contracts with several different contractors for the construction of the proposed buildings to be built on State property and owned by it. Through its administrative board the State had employed architects to prepare plans and specifications and to supervise the construction of such buildings. In August, 1938, defendant was engaged in the business of selling brick and tile, as representative or agent for manufacturers, and desired to sell such products to contractors for use in construction of the proposed State buildings.

Plaintiff's business activities prior to August, 1938, had been somewhat varied. He had been employed by a railroad company and thereafter for about seven years in the purchasing department of an automobile plant; he had been engaged for some time in the building construction business; he had been employed by the State liquor control commission and by the United States treasury department; he had been engaged in the retail store business; he had sold coal, cement, office supplies, machinery, and other merchandise to the State of Michigan; and had also represented an Ohio brick company for a short time.

In August, 1938, one George Kruer, president and principal stockholder of defendant company, sought

out plaintiff, and they had several interviews resulting in the oral contract in question. The testimony of plaintiff and Kruer is conflicting in general as to the intent, purpose and terms of such contract. As the validity of the oral contract is the principal question in this case, we shall set forth at some length the testimony of plaintiff and Kruer. Plaintiff testified in part:

"I became acquainted with Mr. Kruer in August, 1938. I first met Mr. Kruer at the Roosevelt hotel at Lansing. At that time I was representing the Ohio Brick Company. I had sold two jobs on State buildings. I was not engaged in any other employment outside of selling brick in August, 1938; that was my entire activity, at that time. * * *

"After we (Kruer and plaintiff) were introduced, he advanced the proposition that I come with his company to sell brick and tile around these State jobs. * * *

"After the first visit I saw Mr. Kruer early the next following week. He came to Lansing. I think he saw me at the Roosevelt hotel, near there, somewhere around there. At that time I told him, 'All right.' * * *

" 'I will go along with you and sell your brick.' * * *

"Nobody was present at either of our conversations outside of the two of us. There was no arrangement made at that time as to what I was to receive for my services, but there was an arrangement made as to what I should do. I was to contact the architects on all these State jobs and work with them, and Mr. Kruer said he would work with the contractors. That was the talk. I was to get paid for brick and tile that was sold on these State jobs. * * *

"On all brick and tile sold, whether sold by myself through the architect or through Mr. Kruer to the contractor. * * *

"We had no understanding about selling brick to anybody except public institutions.  *   *   *

"The next time I saw Mr. Kruer was shortly afterwards.  *   *   *

"I had this talk with Mr. Kruer about those jobs in the dining room in the Morton hotel (Grand Rapids).  *   *   *  He said to me, 'Now then what commission do you want on the brick?' I said, '$2 a thousand.' He said, 'All right,' and he asked me if six per cent. would be O.K. on tile; I said, 'Yes,' and we agreed on six per cent. on tile and $2 a thousand on brick."

On cross-examination, plaintiff testified in part:

"I first met Mr. Kruer of the Lincoln Brick Company at the Roosevelt hotel at Lansing. At that time I was in the hotel room we had there, in Mr. George Schroeder's office. At that time Mr. Schroeder was a member of the State legislature; he was speaker of the house.  *   *   *  At that time I did not tell Mr. Kruer that I had considerable political influence.  *   *   *  And I didn't have any influence whatsoever with any other administrative officials in the Democratic party, nor with the heads of any of the departments; didn't have the slightest influence.  *   *   *  At any of the later meetings I never told him I had any influence with department heads or with the administration. He always inferred it but I didn't say it."

In fairness to Mr. Schroeder, no claim has been made that he was a knowing participant in any improper dealings. Mr. Kruer, the president of defendant company, presented an entirely different version of the oral contract in question. He testified in part:

"I met him (plaintiff) in the Roosevelt hotel, Lansing, in the headquarters of Mr. George Schroeder, political headquarters.  *   *   *·  I had

never known him before that time. * * * He (plaintiff) told me that he did have political connections with the administration, that he could do me some good. I told him that I wanted to sell brick and glazed tile on certain institutions, and he said well he thought we could get together on that. * * * He said that he had political connections that he thought he could do me some good. * * * He said he was connected very closely and of course it was very evident that he was. * * *

"He said he was very close to George Schroeder, that he was close to the governor, * * * and that he was close to a number of the boys, as he called them, that did things in Lansing. * * * The commission on the glazed tile was to be six per cent., and the commission on face brick was to be $1 per thousand and not $2. * * * We made an arrangement to go and see Architect Sorenson in Detroit. * * * We went up to Mr. Sorenson's office and Mr. Mahoney and Mr. Sorenson stepped in another room and they apparently talked in there. * * * I asked Mr. Mahoney what had transpired. He told me that he had told Mr. Sorenson who he was and that he represented the crowd at Lansing, * * * he did infer that he was very—was referring to the powers in authority at Lansing, and that he had sold Mr. Sorenson on the idea of playing ball, and I asked him what he meant by 'playing ball.' Well he said he will see that you get this face brick. * * * That connection there resulted in our getting the face brick job at the Wahjamega State hospital. * * *

"Our agreement was to work out each individual job as we went along, and based on his representation that he had political influence with these architects and with the State administrative people that he could use. * * *

"Q. (Cross-examination.) You were perfectly willing to contact him for that influence, weren't you?

"A. Yes, I was, I am sorry to say.

"*Q.* Why are you sorry to say it?

"*A.* Because I don't think it was the proper thing for me to do.

"*Q.* You think so now that you have been sued, don't you?

"*A.* That is right."

It appears from the record that the brick and tile sold by defendant to contractors on State building projects met the architects' specifications, and there is no claim that the State was defrauded as to quality or price of materials. It is also admitted that the brick and tile in question were sold and charged by defendant company to the contractors and not to the State.

Following the making of the oral contract in August, 1938, plaintiff interviewed architects and, in some instances, at the request of Kruer, interviewed contractors. Plaintiff and Kruer worked together, their efforts resulting in the sale to contractors of large quantities of brick, tile, and other products. The testimony as to the selling activities of plaintiff and Kruer is particularly important in determining the intent and purpose of the parties in making the oral contract in question. Kruer testified in substance that plaintiff used or attempted to use political connections, influence, and pressure in his contracts with architects and contractors. Plaintiff denied that he used or attempted to use any political influence or coercion. However, his testimony rather indicates otherwise. He said in part:

"I called on architects. The Smith, Boles Company are in the Michigan Theater building at Detroit. Mr. Kruer asked me to go up and see them. * * *

"He (Smith) asked me where I was from. I told him, and I said we would like to have the business providing we can get it, and meet specifications

and prices. I said, 'I am connected with Mr. Murphy's campaign and for that reason I think we ought to have it if we can meet prices and specifications,' and I will say here now that no job was placed with the State of Michigan that wasn't sold at a lower price. I don't believe I said anything to him about getting money for the campaign. * *` * I certainly didn't solicit any campaign funds from him. * * *

"I called on a Mr. Branson Gamber, an architect in the Union Guardian building, Detroit, and solicited business from him. * * * That was with respect to the Pontiac State hospital."

An engineer employed by the general contractor on one of the State building projects testified in part:

"I had a talk with the plaintiff, Mr. Mahoney. I talked over the phone, the phone rang on my desk and he said, 'This is Mahoney, I am talking from the governor's office.' * * * I said, 'No, I am sorry that the contract is let and I can't consider any offering.' So then he said, 'Well I think probably it is wise if you do consider it,' he says, 'You know it is wise for a man to know what side of the bread the butter is on and probably if you get into a little difficulty on the job we might be able to help you.'"

An officer of a firm having a State building construction contract testified regarding his interview with plaintiff Mahoney as follows:

"Shortly after we obtained the subcontract on the 14th of September, we had a call at this office from Mr. Edward J. Mahoney. * * * He told me he was campaign manager for Governor Murphy, and that he wanted the order for that tile so that the proceeds of the commissions could go to the governor's campaign fund. Governor Murphy was running for re-election at that time."

An architect on whom plaintiff called regarding the sale of defendant's brick testified in part:

"When he first came Mr. Mahoney brought up the question of selecting this face brick for the Pontiac State hospital, and he indicated that he had certain connections and that it would be—he thought it would be advisable for us to select the brick from the particular company which he mentioned * *, * he indicated that his interest in the matter was also political due to his friendship with Governor Murphy, and he indicated that it would be very good policy on our part to order the brick from this source, because of the connections between him and the governor."

However, nothing in the record establishes that Governor Murphy had any knowledge whatever of the mention of his name by plaintiff. The record shows that plaintiff had no particular experience in either the manufacture or sale of brick and tile; that when he called on architects and contractors while representing defendant company he did not carry samples or have a price list and was not familiar with the brick and tile which he was attempting to sell. It appears that some time prior to instituting the present law action, plaintiff had begun a chancery suit against defendant in the circuit court of Ingham county. Such suit was later dismissed without prejudice. In his sworn bill of complaint in such chancery suit, which bill was introduced in evidence in the present case, plaintiff stated in part:

"That your plaintiff (Mahoney) is a resident of the city of Lansing, county of Ingham, State of Michigan, and has at divers times held appointive positions with the State government of the State of Michigan and has a large acquaintance among the State officials and heads of departments of the State of Michigan. * * *

"That on or about the 15th day of August, 1938, said plaintiff at the solicitation of the said defendant, entered into an oral agreement with the said defendant whereby this plaintiff agreed to use his influence with the architects and contractors doing business for the State of Michigan and with the heads of departments having charge of the construction of said projects to obtain orders for brick and tile being handled by the said defendant.     *     *     *

"That in pursuance of said agreement this plaintiff did use his influence with said contractors and architects and heads of departments and as a result thereof this plaintiff brought the said defendant in contact with the architects and contractors and heads of the State departments supervising the constructions of said projects, using such material, and as a result thereof the said defendant company obtained large orders for materials."

The testimony clearly shows that defendant company employed plaintiff because it believed that he had political influence and connections which would enable it to sell brick and tile to contractors on State building projects. The only question for determination is, whether the oral contract between plaintiff and defendant was void as against public policy.

Plaintiff admits that he was to receive commissions only on brick and tile sold to contractors for use in the construction of State buildings, but contends that, because the oral contract in question provided for the sale of brick and tile to contractors and not to the State, the question of political influence and public policy was not involved. Plaintiff testified that he was "to contact the architects on all these State jobs." The architects employed by the State to supervise the construction work were State employees and had some control over the selection of materials by the contractors. Plaintiff

testified, "Of course the architect is the big influence in any construction job.   *   *   *   I would say after the final recourse the architect would overrule the contractor."   Any contract under which the parties proposed and intended by political influence or coercion to affect the judgment and decision of such architects in the selection of materials would be *contra bonos mores* and void.   The testimony is convincing that the parties intended that plaintiff would use or attempt to use such political influence, pressure, and means as he could to induce the purchase of defendant's brick and tile.   This was clearly an attempt to exercise improper influence on State-employed architects in respect to public business entrusted to them.   The record is barren of any proof that plaintiff had the influence he-claimed for himself, except by inference.   However, such type of contract is against the public good and is void.

In 12 Am. Jur. § 167, p. 664, it is stated:

"The question whether a contract is against public policy depends upon its purpose and tendency, and not upon the fact that no harm results from it. In other words, all agreements the purpose of which is to create a situation which tends to operate to the detriment of the public interest are against public policy and void, whether in the particular case the purpose of the agreement is or is not effectuated.   For a particular undertaking to be against public policy actual injury need not be shown; it is enough if the potentialities for harm are present."

The rule directly applicable to the contract in the present case is stated in 46 A. L. R. p. 198, as follows:

"However, beyond question, any agreement entered into because of the actual or supposed influence which the employee has, engaging him to influence administrative or executive officers in the

discharge of their duties, which contemplates the use of personal influence and personal solicitation rather than any appeal to the judgment of the officer on the merits of the object sought, is contrary to public policy and void.''

In the case of *Beal* v. *Polhemus,* 67 Mich. 130, this court quoted with approval the following statement from the opinion in *Oscanyan* v. *Arms Co.,* 103 U. S. 261 (26 L. Ed. 539) :

''Personal influence to be exercised over an officer of the government in the procurement of contracts is not a vendible article in our system of laws and morals, and the courts of the United States will not lend their aid to the vendor to collect the price of the article.''

In *Robinson* v. *Patterson,* 71 Mich. 141, 149, we said:

''Contracts in their nature calculated to influence the action of public officers, and the effect of which is to influence them one way or the other, are against public policy, and void.''

In 17 C. J. S. § 211, pp. 563–565, it is stated:

''Contracts contrary to public policy, that is those which tend to be injurious to the public or against the public good, are illegal and void, even though actual injury does not result therefrom. This rule is applied in both State and Federal courts, in cases arising in law and in equity, to contracts involving numerous and steadily increasing types of subject matter, regardless of the character of the contracting parties.    *    *    *
''*The test to be applied is not what is actually done, but that which may or might be done under the terms of the contract; it is the evil tendency of the contract and not its actual injury to the public in a particular instance. The law looks to the*

*general tendency of such agreements, and it closes the door to temptation by refusing them recognition in any of its courts."*

See, also, *Benson* v. *Bawden,* 149 Mich. 584 (13 L. R. A. [N. S.] 721); *McNamara* v. *Gargett,* 68 Mich. 454 (13 Am. St. Rep. 355); *Hannah* v. *Fife,* 27 Mich. 172; *Hayward* v. *Nordberg Manfg. Co.,* 29 C. C. A. 438 (85 Fed. 4); *Old Dominion Transportation Co.* v. *Hamilton,* 146 Va. 594 (131 S. E. 850, 46 A. L. R. 186); 29 A. L. R. pp. 157, 158; 6 R. C. L. p. 708; 6 Williston on Contracts (Rev. Ed.), §§ 1729A, 1761, pp. 4883, 5000.

The circuit judge saw and heard the witnesses, without a jury.

"The trier of the facts saw and heard the witnesses and is, therefore, a more competent judge of their credibility than we are on appeal." *Kundel* v. *Portz,* 301 Mich. 195, 210.

"In a law case tried without a jury, the trial court is the judge of the weight of the evidence and the credibility of the witnesses; unless the findings are against the preponderance of the evidence, the judgment is not disturbed on appeal." *Toussaint* v. *Conta,* 292 Mich. 366.

"In reviewing a judgment entered by a trial judge sitting without a jury we are limited by the rule laid down in *Jones* v. *Eastern Michigan Motorbuses,* 287 Mich. 619. See discussion beginning at page 643. This rule was recently summarized in *Eagan* v. *Edwards,* 294 Mich. 260, by the following quotation from *Vannett* v. *Michigan Public Service Co.,* 289 Mich. 212, 218:

" 'We have repeatedly said in cases tried without a jury that the trial judge is the trier of the facts and may give such weight to the testimony as in his opinion it is entitled to. In such cases we do not reverse unless the evidence clearly preponderates in

the opposite direction.' "  *Hanson* v. *Economical Cunningham Drug Stores, Inc.*, 299 Mich. 434.

The conclusion and judgment of the circuit judge are supported by the record.  Judgment affirmed, with costs.

CHANDLER, NORTH, STARR, WIEST, BUTZEL, BUSH-NELL, and SHARPE, JJ., concurred.