GRAY v CITY OF GALESBURG

1. CONTRACTS—RELEASE OF LIABILITY—CRIMINAL LAW—DISMISSAL OF
      CHARGES—PUBLIC VALUE.

  A release signed by a criminal defendant, releasing a city and
      individual police officers from civil liability to the defendant
      and executed upon dismissal of criminal charges against the
      defendant, is of questionable public value because of govern-
      mental immunity and may directly contravene the public inter-
      est by denying redress to the victim of tortious conduct by the
      officers.

2. CONTRACTS—RELEASE OF LIABILITY—CRIMINAL LAW—DISMISSAL OF
      CHARGES.

  An agreement to release a city and its police officers from any
      liability to a criminal defendant in exchange for a dismissal of
      criminal charges is objectionable because the extraction of such
      a release while the defendant is in custody presents too great
      an opportunity for officials to employ coercion, as well as a
      temptation to the prosecutor to exaggerate the charges against
      the defendant to enhance the prosecutor's bargaining position.

3. CONTRACTS—PUBLIC POLICY—INJURY TO PUBLIC.

  An actual showing of public injury is not required to conclude
      that an agreement violates public policy; it is sufficient that
      contracts of the same general nature tend or will tend to
      subvert the public interest.

4. CONTRACTS—RELEASE OF LIABILITY—CRIMINAL LAW—DISMISSAL OF
      CHARGES—PUBLIC POLICY.

  An agreement to release a city and individual police officers from
      any liability to a criminal defendant in exchange for a dis-
      missal of criminal charges against the defendant is void and
      unenforceable because it is against public policy.

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 4] 17 Am Jur 2d, Contracts §§ 188–191.
    21 Am Jur 2d, Criminal Law §§ 513, 516.
[3] 17 Am Jur 2d, Contracts § 179.

Appeal from Kalamazoo, Raymond W. Fox, J. Submitted June 3, 1976, at Grand Rapids. (Docket No. 25142.) Decided September 8, 1976.

Complaint by Green P. Gray against the City of Galesburg for rescission of a release executed by the plaintiff in favor of the defendant. Judgment for defendant. Plaintiff appeals. Reversed.

*Doerr, Doerr & Adams, P. C.,* for plaintiff.

*Morris & Culver, P. C.,* for defendant.

Before: DANHOF, C. J., and D. E. HOLBROOK and D. L. MUNRO,* JJ.

D. L. MUNRO, J. Plaintiff initiated this action in circuit court for rescission of a release executed by him in favor of the defendant. A trial was held before the court sitting without a jury on stipulated facts which resulted, on July 11, 1975, in a judgment for the defendant. The plaintiff appeals as of right.

The operative facts were set out by the trial court in his opinion:

"This plaintiff and his son Gerald Gray were arrested for and charged with a violation of the Galesburg City Ordinance as to disorderly persons. On July 25, 1973, Green Perry Gray and Gerald Wayne Gray appeared before the Honorable Charles A. Pratt, 8th District Judge. Defendants were represented by Mr. John P. Doerr and the City of Galesburg was represented by Mr. William H. Culver. The transcript of the proceedings of that day reveal that Mr. Culver moved to dismiss the two charges. Mr. Doerr indicated that defendants had no objection. Mr. Culver then stated that 'The record may show that—the two Mr. Grays are

_____
* Circuit judge, sitting on the Court of Appeals by assignment.

signing a release of the City of Galesburg and also the police officer'. Continuing Mr. Culver said, 'from any claim, is that correct?' Each Mr. Gray responded 'yes'. The Court then inquired of the Grays; 'And is agreeable to both of you what has been discussed?' And the answer was 'Yes'. The motion to dismiss in each case was granted. In this case Green Perry Gray now seeks to have the release set aside on the ground that it was executed under duress and threat of criminal prosecution and was based upon a promise by the defendant to refrain from pressing a criminal charge and that the release is therefore contrary to public policy and invalid on the ground of illegality of consideration.

"There was discussion as to whether the One Dollar ($1.00) called for in the release was in fact paid but for the purposes of this decision the Court will conclude that it was not paid.

"A copy of the release was attached to the complaint. By the release Green Perry Gray and Gerald Wayne Gray released the City of Galesburg and its employees and David Henson, its Chief of Police, from liability for any consequential damages as a result of their action on the 11th day of June, 1973. The two Grays also convenanted not to sue the City of Galesburg, David Henson or Ron Knight or its employees or agents. The signature of each of the Grays was witnessed by John P. Doerr. It is Mr. Doerr's firm which now seeks recision in behalf of this Plaintiff, Green Perry Gray."

The appellate courts of this state have not previously addressed the question of whether such an agreement as is considered here is violative of public policy. The first step in that analysis is the determination of the nature of the rights being bargained with. On the part of the city there has been conceded the right to prosecute the Grays for an alleged violation of a city ordinance, clearly a public interest. In return, the city and two individuals, employees of the city, were released from civil liability. The nature and value of this consideration is complex.

Protecting the city from liability is a public interest and one with which the city attorney rightfully concerns himself. However, in Michigan, municipal governments are protected from most tort liability by grant of immunity. MCLA 691.1407; MSA 3.996(107). *Kelley v East Lansing,* 50 Mich App 511; 213 NW2d 557 (1973), *McPherson v Fitzpatrick,* 63 Mich App 461; 234 NW2d 566 (1975). We do not decide the issue of immunity here, but we do observe that as of the date of the release, plaintiffs may have had no cause of action against the city, thus rendering release of the city, as consideration, illusory.

It would appear, therefore, that the most significant portion of the consideration received for the city's promise flowed directly to the benefit of the individual policemen. The contract for release, if viewed in this light, becomes a trade-off of a public interest for a private interest. We recognize that there may be an indirect public interest in protecting the city's employees from civil liability incurred while in the city's employ. The city will naturally want to support its officers to insure that able men will be attracted to, and remain with, the police force. However, if the officers' conduct was tortious, the public has no interest in denying their victims redress. If, on the other hand, the officers acted legally, they are afforded the full protection of the law and need not resort to the release for vindication.

The net effect of the agreement between Culver and the Grays is to bargain away the people's right to see criminal offenders prosecuted, in return for an agreement to hold harmless private individuals which, at best, is of indirect public value and, at worst, directly contravenes the public interest. In the words of Justice COOLEY,

"The highest considerations of public policy demand that the pecuniary interests of individuals should not be recognized as legitimate motives to influence the action of official persons, and that in the case of courts most especially, every avenue should be carefully guarded against the intrusion of such motives." *Buck v First National Bank of Paw Paw,* 27 Mich 293, 302; 15 AR 189 (1873).

It is not for the above reason alone that we find this agreement objectionable. The extraction of such a release while the defendant is in custody presents too great an opportunity for officials to employ coercion. The concept of duress by imprisonment is as old as our law. See *Baker v Morton,* 79 US (12 Wall) 150; 20 L Ed 262 (1871). To a defendant such a release may seem a small price for his freedom, whether the imprisonment is just or not. The coercive atmosphere created by imprisonment is not significantly lessened by the defendant's temporary release on bail, as he must ultimately surrender and resubmit himself to imprisonment. See *Boyd v Adams,* 513 F2d 83, 87–88 (CA 7, 1975), and *Bucher v Krause,* 200 F2d 576 (CA 7, 1952).

Furthermore, a desire on the part of the prosecuting authority to extract police officers from possible liability offers an undeniable temptation to concoct or exaggerate the charges against the defendant to enhance his bargaining position.

" 'The Government may not prosecute for the purpose of deterring people from exercising their right to protest official misconduct and petition for redress of grievances.

\* \* \*

" 'The major evil of these agreements is not that charges are sometimes dropped against people who probably should be prosecuted. Much more important,

these agreements suppress complaints against police misconduct which should be thoroughly aired in a free society. And they tempt the prosecutor to trump up charges for use in bargaining for suppression of the complaint. The danger of concocted charges is particularly great because complaints against the police usually arise in connection with arrests for extremely vague offenses such as disorderly conduct or resisting arrest.' " *Boyd, supra,* 88–89, quoting *Dixon v District of Columbia,* 129 US App DC 341; 394 F2d 966, 968–969 (1968).

In Michigan, an actual showing of public injury is not required to conclude that an agreement violates public policy. It is sufficient that contracts of the same general nature tend or will tend to subvert the public interest.

" 'The question whether a contract is against public policy depends upon its purpose and tendency, and not upon the fact that no harm results from it. In other words, all agreements the purpose of which is to create a situation which tends to operate to the detriment of the public interest are against public policy and void, whether in the particular case the purpose of the agreement is or is not effectuated. For a particular undertaking to be against public policy actual injury need not be shown; it is enough if the potentialities for harm are present.' " *Mahoney v Lincoln Brick Co,* 304 Mich 694, 705; 8 NW2d 883 (1943). *Federoff v Ewing,* 386 Mich 474, 481; 192 NW2d 242 (1971).

We find that this agreement is repugnant to public policy because contracts of such a nature may tend to deprive the public of their right to vigorous enforcement of penal statutes and ordinances for the predominant purpose of benefiting individual persons, and because contracts executed under such circumstances are inherently coercive. As the contract here in question violates public

policy, the entire contract is void and unenforceable. We are not alone in this conclusion:

" 'It is no part of the proper duty of a prosecutor to use a criminal prosecution to forestall a civil proceeding by the defendant against policemen, even where the civil case arises from the events that are also the basis for the criminal charge. * * * What [the prosecutor] cannot do is condition a voluntary dismissal of a charge upon a stipulation by the defendant that is designed to forestall the latter's civil case.'

"An application of the principles of these cases leads us to the conclusion that this release is invalid as a matter of public policy." *Boyd v Adams, supra,* 89.

In deciding as we do here, we recognize that similar classes of agreements are created in the public interest, and as such are valid and enforceable. Parties may exchange or forego private rights, as is frequently done in the settlement of civil litigation, with the encouragement of the court. Similarly, public rights may, in the discretion of prosecutors or other officials, be exchanged for public benefits, as often occurs in plea bargaining or in the granting of immunity to an accomplice in exchange for his testimony. Such bargains will remain unaffected by our holding.

Reversed. No costs, a public question being involved.