# CHARLES R. SCHIRM *vs.* LEOPOLD H. WIEMAN.

*Contracts—Legality—Agreement to Pay for the Return of Stolen Property.*

A contract by which a party agrees to pay money for the return of his property which had been stolen is not illegal or against public policy, provided there is no stipulation to refrain from prosecuting the criminal or to compound the felony.

Some months after defendant's watch had been stolen from him a third party, acting as a go between, informed plaintiff that the watch was in the possession of a person in another State and that if defendant would pay a certain sum the watch would be returned to him. Plaintiff communicated this offer to the defendant who agreed to pay the money demanded. Thereupon the third party got the watch and informed the plaintiff that it was ready to be delivered upon receipt of the designated sum. Defendant gave to plaintiff a check for the amount, payable to the order of plaintiff. The check was cashed by the plaintiff at his own bank, upon his endorsement, and not at the bank upon which it was drawn; the money was paid by plaintiff to the intermediary and the watch delivered to the defendant. On the same day defendant stopped payment of his check and the plaintiff brought this action to recover the amount so paid by him. *Held,* that defendant's agreement to pay for the return of his property was not illegal, and the plaintiff is entitled to recover.

Appeal from the Superior Court of Baltimore City (SHARP, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, SCHMUCKER, JONES and BURKE, JJ.

*J. Cookman Boyd,* for the appellant.

*Alonzo L. Miles* and *German H. H. Emory* (with whom was *John T. Morris* on the brief ), for the appellee.

PAGE, J., delivered the opinion of the Court.

This suit was instituted to recover upon a check given to the appellant by the appellee, under the circumstances which

will afterwards be stated.   The case was tried without the in-
tervention of a jury, and but one exception was taken, and
that was to the action of the Court upon the prayers asked
for by the respective parties.   The Court by its granted in-
struction, decided there was no sufficient evidence to entitle
the appellant to recover.   The judgment being against him,
the appellant has appealed.

The following facts appear from the record : In July, 1904,
the appellant and the appellee, together with two other per-
sons, all members of the Order of Elks, occupied the same
room in a hotel in the city of Cincinnati, on the occasion of a
convention of the members of that order.   During the night,
the watch of the appellee was lost, under circumstances which
led to the belief that it had been stolen.   Notice was given by
the appellee of his loss, and extensive searches therefor were
instituted, by officers and detectives, throughout the hotel
and elsewhere, without however obtaining any clue as to the
manner of its mysterious disappearance.   The appellee ob-
tained no information about his watch, until the 7th of Decem-
ber, 1904.   About that time the appellant had an interview
with a Mr. Lyons, since deceased, a detective in the city of
Baltimore.   After pledging him not to reveal what he was
about to tell him, Lyons told the appellant that the appellee
could recover his watch, but would have to pay for it " that
"parties outside the State had communicated with him and
told him they would accept $350 for it." Neither at that time
nor subsequently, was the appellant informed who these per-
sons were and he never knew more of the matter that was
communicated to him by the detective Lyons.   It was shown,
that on that occasion, Lyons employed the appellant "to com-
municate this information to Mr. Wieman, and if Mr. Wieman
was satisfied to accept the proposition, to turn over the money
to Lyons and get the watch and return it to Wieman."   The
appellant also stated in evidence and there is nothing to con-
tradict or in any respect impeach it, that he knew of the loss
of the watch and believed it had been stolen ; but he had no
knowledge as to that fact or the manner of its loss, other than

that which Wieman himself communicated to him. The appellant communicated this conversation to the appellee. At first, the latter refused to pay anything; but after several weeks he agreed to give $300 if the watch could be returned to him in good condition. The appellant so informed Lyons, and the sum was then agreed to. The appellant testifies without being contradicted, that the state of his knowledge at that time was that "Mr. Wieman agreed to pay the money; that the watch was at that time outside the State and that it was sent for at his (Wieman's) request, through him and that Lyons would not have sent to New York for the watch, except Mr. Wieman had authorized me to tell him to have it sent for and that he (Wieman) would pay the $300 for it."

It was under these circumstances that the appellee and appellant met on the 4th April to carry out the understanding between them as to the return of the watch. Wieman's account of the conversation, is substantially as follows : Schirm asked Wieman, have you got the money ? "Wieman replied he had a check," that he paid everything by check, and besides he said "suppose he gave a check and that fellow should pocket the money and keep the watch too, he would have no redress" and "how do I know the watch is not all battered up." He, Wieman, then suggested to call in Hennegen & Bates and let them examine the watch. Schirm objected to this. Wieman then proceeds, "there is no shenanigan about this." I was to say this and when I did make that remark I felt a little guilty because there was some scheme arranged beforehand to have a deputy sheriff there, and to seize it, 'but I told him there was no shenanigan about it.' I wanted the watch at any price." He, Schirm, said "well I will tell you what I will do, I will go to your bank and cash that check. I will first go to the other party and show them I have got the check." In reference to the last statement, the testimony of the appellant is, that he (Schirm) said "I will go over to the Fidelity and Deposit Company and get it cashed, because I will have to deliver the cash for it." Upon this conversation the appellee delivered the check on the Drovers and Mechan-

ics National Bank to the appellant, who endorsed it and had it cashed at the Fidelity and Deposit Company after it was endorsed by Schirm. With the proceeds Schirm obtained the watch and delivered it to the appellee. The payment of it was the same day stopped by Wieman, and the appellant afterwards was compelled to make it good and has not since been reimbursed.

It is contended that under these circumstances there can be no recovery because the consideration of the check was the advancement of money to be used for an illegal purpose, that is, for securing the return by a thief of property, alleged to have been stolen. It undoubtedly is a correct principle that one who furnishes funds to another who he knows or has every reason to believe intends to devote them to the perpetration of crime, and that they were procured for that purpose will not be allowed to maintain an action on his contract. He can not do so, for the reason that as was said by Judge Story in his *Conflict of Laws* sec. 253, "no one can hesitate to say that such a man voluntarily aids in the perpetration of the fraud, and morally speaking is almost, if not quite, as guilty as the principal offender." *Hanauer* v. *Doane*, 79 U. S. 342. But is that the case with which we are now dealing? Was it intended by any of the parties to perpetrate a crime with the proceeds of a check? The purpose as shown, was to employ it in an arrangement having for its object the return of the watch, by the supposed thief, to its real owner. Unless this object, was for some sufficient reason fraudulent, or legally wrong, or contrary to public policy the act of the appellant in advancing or otherwise procuring the money on the appellee's check, cannot be so tainted as to preclude the recovery by the appellant of the amount paid him on that account. And this legal conclusion would be equally sound even though in the transaction in which he advanced his own money or credit for the use of the appellee, the appellant was acting as the agent of the detective or even of the thief inasmuch as it was on the credit of the appellee that he acted, unless by so doing he participated in some wrong act.

It seems to be clear that unless it can be maintained that it was illegal or morally wrong or contrary to public policy, for the appellee to pay money to the detective or to any one else, for the purpose of recovering his own property, the legal right of the appellant to recover from Wieman in this case cannot be questioned. Now was it illegal or morally wrong, or contrary to public policy for Wieman to pay money to secure the recovery of his own property which presumably had been stolen? The solution of this question depends upon the nature of the act and its effect upon the public interest. Every case of larceny may be considered from two points of view; first with respect to the interest of the general public in the matter and then as to the interests of the real owner of the lost property. As to the first, it seems to be clear, that the public has no property interest and indeed no other interest, except such as grows out of its duty to protect property and enforce its laws in the interest of the public. . For these reasons, it is of public interest and in accordance with public policy that the laws for the protection of property shall be effective, in order that the offenders may be promptly apprehended and convicted. Therefore all proposed agreements made with the thief or with any one, by which the apprehension of the criminal, his trial or conviction may be prevented or obstructed, are contrary to public policy and absolutely void. With respect to the personal property interests of the real owner, the public has no particular concern. There can be no reason assigned why the owner of stolen property cannot pursue his own interest as he deems proper, so long as there is no interference with the proper enforcement of the laws in the pursuit, apprehension and conviction of the criminal. The owner may properly take no step nor make contracts or arrangements that in any respect will interfere with the performance of these things. He may sue the thief or others in the possession of the stolen property in replevin or by any other appropriate proceeding, and it seems to be without reason to deny him the right to negotiate for the return of any of the property he could sue for, provided he agrees to nothing that

has the object or effect of obstructing, impeding or preventing the apprehension or conviction of the criminal. Upon a contract containing snch features having such a purpose or effect there can be no recovery; it is contrary to public policy and void; and it may be added that if any one advances money for such a purpose, participates in the illegal purpose, and his contract for that purpose is tainted contrary to the public interest and is void.

There seems to be a wide concurrence in the general principle that a contract for the return of stolen property to the true owner is not void, as being contrary to public policy, so long as it does not interfere or tend to interfere with the public interest and duty respecting the apprehension or conviction of the criminal. It was stated by the Supreme Court of the United States in 144 U. S. 224, that "ordinarily the law leaves to parties the right to make such contracts as they please demanding however that they shall not require either party to do an illegal thing and that they shall not be against public policy or in restraint of trade."

In *Burnett* v. *Weber*, 125 N. Y. 22, a suit to foreclose a mortgage, given to secure to the plaintiff, payment for goods stolen, the defense set up was that it was given to compound a felony; the Court held that, it was necessary "to show that there was some agreement or promise on the part of the mortgagee to "forbear prosecution for the crime, or to suppress evidence that would tend to prove it." So in *Ford* v. *Cratty*, 52 Ills. 318, an attorney who retained and refused to pay over money of his client, was shown a warrant for embezzlement and told that unless he paid or secured the claim, the prosecution would be pushed to a conclusion. It was held not to be regarded as having been given to compound a felony. The same view is maintained in *Brittin* v. *Chegary*, 20 N. J. L. 630; *Deere* v. *Wolff*, 65 Iowa 37.

In *Ward* v. *Lloyd*, 46 E. C. L. 785, it was moved to set aside a warrant on the ground that it was founded upon an illegal consideration, namely, an agreement to abstain from prosecuting the defendant for embezzlement. The Court held

per TINDAL, C. J., that "this is not a case of security given to . induce an uninterested party to withhold a charge of a criminal nature; there is a just debt due from the defendant to the plaintiff"—and MAULE, J., said "the plaintiff demanded what he had a perfect right to demand, viz., the money due to him; and the defendant did what he was bound to do, namely, give a security for money he was bound to pay." *Portner* v. *Kirschner*, 169 Pa. St. 472; *Cass County Bank* v. *Bricker*, 34 Neb. 516. Many other cases of similar import could be cited. A large number of these will be found referred to in the 6th vol. *Am. & Eng. Enc. of Law*, p. 410 and note 6, to the effect that it is perfectly lawful for the parties to compromise the civil liability arising from the commission of an offense, and if this be the sole purpose it is valid.

In this case there is no evidence that the appellee agreed to compound the felony or intended to do so. In fact the proof is not clear that it was the thief who had the possession of the watch. Many circumstances might have then existed which would show that the person for whom the detective was acting, came into its possession, without having been guilty of a crime. But without laying much stress upon this, the evidence makes it clear that the purpose of the appellee was solely to regain his property and in his efforts to do so, carefully refrained from making any terms, other than upon the payment of the money he was to receive his property. In *Brittin* v. *Chegary* (*supra*), the Court said of a transaction similar in some respects to this, that it was "merely getting his own money."

We hold that Wieman in paying the money and receiving the property, did not violate any rule of law, and therefore the act of Schirm in having the check cashed upon his endorsement, does not now preclude him from recovering from Wieman the amount which in consequence thereof he has had to pay.

It follows, that the plaintiff's first prayer should have been granted, and the first of the defendant rejected. The other prayers were properly refused.

> *Judgment reversed with costs to the appellant and new trial awarded.*

(Decided June 14th, 1906.)