JACOB SPOERER AND CHARLES SPOERER, TRADING
AS CARL SPOERER SONS COMPANY,

*vs.*

HERMAN D. WEHLAND AND CHRISTINA WEH-
LAND, HIS WIFE.

*Contracts*: *duress; equitable relief.   In pari delicto* : *when prin-*
*ciple not applied.*

Where the assent of one to a contract is constrained and
involuntary, he will not be held obligated or bound by it. p. 230

But, as a general rule, an agreement can not be avoided be-
cause of duress upon a third person.                    p. 231

Exception is made, however, where such other person threat-
ened is husband or wife, parent or child, of the person who,
under such duress, enters into a contract in that other's behalf.
pp. 230-231

While in general there is no relief in a court of equity for
parties *in pari delicto,* yet if conditions exist showing that the
parties were not dealing at arm's length, and there was no
equality of situation, and the judgment of one was overborne
by sickness and apprehension of disaster and disgrace, the
maxim does not apply.                                    p. 231

*Decided February 14th, 1917.*

Appeal from the Circuit Court of Baltimore City. (Daw-
kins, J.)

The facts are stated in the opinion of the Court.

The cause was argued before Boyd, C. J., Burke, Thomas,
Pattison, Urner, Stockbridge and Constable, JJ.

*Edward F. Johnson* and *Roland R. Marchant* (with whom
was *Chas. S. Hayden* on the brief), for the appellants.

*Louis P. Bolgiano* and *John G. Schilpp,* for the appellees.

Constable, J., delivered the opinion of the Court.

The appellees, complainants below, filed a bill praying that
the appellants be enjoined from transferring a promissory
note then in their possession and given them by the appellees,
and further praying that the said note should be returned.
The lower Court granted a preliminary injunction, and re-
quired the appellants to show cause why the note should not
be returned.  Upon answer being filed and issue joined,
testimony was taken, and the lower Court passed a decree
granting the relief prayed.  It is from that decree that this
appeal arises.

The bill alleges that the said note was given to the appel-
lants to pay an indebtedness of the appellees' son to the appel-
lants, at a time when the appellees were bereft of their free
will, through fear brought on by intimidation and threats
practised upon them by one of the appellants and their attor-
ney.

It is not our intention to relate in detail the testimony,
taken by both parties, but to give the substance and the con-
clusions we have reached from a careful consideration of it.
The appellees are elderly people living in Howard County,

who have been engaged in farming for a long time. The appellants are the members of a co-partnership, engaged in the automobile, automobile accessories and repair business in Baltimore. William D. Wehland, the son of the appellees, had located in Baltimore and had formed a partnership, with three others, for the purpose of dealing in automobile tires. The affairs of this latter firm, apparently, did not prosper, and on December 23rd, 1915, the appellants were the holders of two of its promissory notes for amounts totalling $529. On December 20th, 1915, a bill for a receiver and an injunction had been filed against the firm, and bankruptcy proceedings were imminent, and on December 24th, 1915, the firm filed a voluntary petition in bankruptcy. The day before the said petition was filed the appellants met at their attorney's office to consult about the claims they held against the insolvent firm. About five o'clock P. M., and within five minutes after the conference began, one of the appellants, together with the attorney with a blank form of promissory note, started, in an automobile, for the home of the appellees. The result of the trip was that they had the appellees sign the said blank note for five hundred and twenty-nine dollars, payable six months after date, to the order of the appellants, and endorsed, without recourse, the two notes of the son's firm, to the appellees.

What transpired at the home of the appellees to induce them to sign the note, taking the burden of the son's firm's debt from the shoulders of the appellants, is told in some detail by the appellees, but is not contradicted in detail by the appellant present and his attorney, they, apparently, relying upon the fact that no express threats were used.

In this the appellees agree with them, but contend, although no direct threats were used, that, nevertheless, it was plain to them, and they so understood, that unless they assumed the debt their son was to be arrested. From our reading of the whole record we can reach no other conclusion, but that the intention of the visit was to bring about that

impression in the minds of the appellees. The testimony
shows that upon their arrival at the house, Mr. Wehland was
not at home, and they spent the time, awaiting his arrival,
in talking generally to Mrs. Wehland, not mentioning to her
the purpose of their visit. Upon the arrival of Mr. Wehland,
the appellant, immediately, plunged into the business at
hand, and told them that there was a rumor in the city that
there was a warrant out for the arrest of the members of the
son's firm (and this is corroborated by the appellant's testi-
mony) upon the charge of selling consigned goods and not
making return for the same. It was told them that this was
a serious charge, making the offenders liable to a fine of five
hundred dollars and imprisonment in the penitentiary. It
was explained to them what was meant by consigned goods.
After these explanations had been made, the appellant said
to them, and we are using the exact words the appellant used
in testifying: "Now, as to our account, you know they are
consigned goods." Could there have been a more veiled
threat employed that this preparation and culminating ques-
tion? We do not think the appellees made any mistake in
implying what they did and what, in our opinion, they were
intended to imply.

Both Mr. and Mrs. Wehland testified that they were ex-
cited and dazed by the news of their son's predicament, and
that the shock upon them was great, since they had always
had had such good reports of him. The appellant testified
that the Wehlands knew absolutely what they were doing, but
in answer to a question as to whether Mr. Wehland was
excited, said: "He was about the same as Mrs. Wehland;
excited about Will being mixed up with this bunch." How-
ever, there was a witness, wholly disinterested, one who
came to the house just as the appellant and his attorney were
leaving, and he described their condition as follows:

"Mrs. Wehland seemed to him much excited and worked
up, so did Mr. Wehland; that Mr. Wehland did not say as
much as Mrs. Wehland; that Mr. Wehland does not talk very

much, and did not talk very much then; that Mrs. Wehland was very much excited and looked as though she was about ready to cry. That Mr. Wehland was quiet, and, of course, he was excited and appeared to be angry." It does not take any great flight of imagination to believe that this witness truly described the mental condition of these old people, after listening to the story of their son from the lips of these business men.

The rule applicable to cases of this character is well stated in *Central Bank* v. *Copeland,* 18 Md. 305, and has been generally cited and quoted with approval in this and other jurisdictions, and is as follows: "The element of obligation upon which a contract may be enforced, springs primarily from the unrestrained mutual assent of the contracting parties, and where the assent of one to a contract is constrained and involuntary, he will not be held obligated or bound by it. A contract, the execution of which is induced by fraud, is void, and a stronger character can not reasonably be assigned to one, the execution of which is obtained by duress. Artifice and force differ only as modes of obtaining the assent of a contracting party, and the contract to which one assents through imposition or overpowering intimidation, will be declared void, on an appeal to either a court of law or equity to enforce it. The question whether one executes a contract or deed with a mind and will sufficiently free to make the act binding, is often difficult to determine, but for that purpose a Court of Equity, unrestrained by the more technical rules which govern courts of law in that respect, will consider all the circumstances from which rational inferences may be drawn, and will refuse its aid against one who, although apparently acting voluntarily, yet, in fact, appears to have executed a contract, with a mind so subdued by harshness, cruelty, extreme distress, or apprehension short of legal duress, as to overpower and control the will."

In 9 R. C. L., sec. 16, p. 726, in the chapter devoted to "Who may take advantage of duress," it is said: "As a gen-

eral rule an agreement can not be avoided because of duress imposed upon a third person. In other words, the law does not regard a person as under duress who enters into a contract to relieve another person and not himself. There are, however, certain exceptions to this rule as well established as the rule itself. The exceptions include husband and wife and parent and child, and either may avoid his contract made to relieve the other from duress. * * * The relations between such persons are so close that the law recognizes that threats against the one will have substantially the same effect on the mind of the other, and what will deprive the one of the free exercise of his will or judgment will have a like effect on the other."

It may be contended that the appellees are not entitled to relief in a Court of Equity, because the parties are *in pari delicto,* in that, the note was given for the purpose of compounding a felony. This, undoubtedly, as a general proposition is correct, but the courts have made certain distinctions, which are well expressed in *Burton* v. *McMillan,* 52 Fla. 469, reported in 8 L. R. A. n. s. 991, and from which we will quote: "There is abundant authority that regard should be had to the age, sex and condition of the parties; and to the circumstances surrounding them at the time of making the contract, in order to determine whether undue influence was exercised, whether the act was voluntary or induced by duress, and, if the conditions existed showing that the parties were not dealing at arms length, and there was no equality of situation, and the judgment of one was overborne by sickness and apprehensions of disaster and disgrace, the maxim *in pari delicto* does not apply. Under such circumstances the question is simply one of undue influence. Particularly there are many and very high authorities holding that the maxim does not apply when the relation of father and son, husband and wife, or other near relationship, exists. *Williams* v. *Bayley,* decided by the House of Lords of England in 1866, reported in L. R. 1 H. L. 200, is a leading case

along this line and is frequently referred to in the American cases sustaining similar views. In this case a son carried to bankers, of whom he, as well as his father, was a customer, certain promissory notes with his father's name upon them as endorser. These endorsements were forgeries. On one occasion the father's attention was called to the fact that a promissory note of his son with his (the father's) name on it was lying at the bankers dishonored. He seemed to have communicated the fact to the son, who immediately redeemed it; but there was no direct evidence to show whether the father did or did not really understand the nature of the transaction. The fact of the forgery was afterwards discovered. The son did not deny it. The bankers insisted (though without any direct threat of prosecution) on a settlement to which the father was to be a party. He consented and executed an agreement to make an equitable mortgage of his property. The notes with the forged endorsements were delivered to him. 'Held that the agreement was invalid. A father appealed to, under such circumstances, to take upon himself a civil liability, with the knowledge that unless he does so his son will be exposed to a criminal prosecution, with the moral certainty of conviction, even though that is not put forward by any party as a motive for the agreement, is not a free and voluntary agent, and the agreement he makes is not enforceable in equity.' The father in this case was relieved of his contract, because he made it when he was under pressure of relieving his son from a criminal prosecution, and was not a free and voluntary agent." The Court then cited and reviewed the following cases in support of its position: *Central Bank* v. *Copeland, supra; Karris* v. *Carmody,* 131 Mass. 51; *Morse* v. *Woodworth,* 155 Mass. 233; *Mack* v. *Prang,* 104 Wis. 1; *Galusha* v. *Sherman,* 105 Wis. 263; *Benedict* v. *Rome,* 106 Mich. 378; *Adams* v. *Irving Nat. Bank,* 116 N. Y. 606; *Heaton* v. *Norton Bank,* 5 Kan. App. 498; *Bentley* v. *Robson,* 117 Mich. 691; *Foley* v. *Greene,* 14 R. I. 618, and concluded that the decisions cited bore out the

proposition, that the maxim *in pari delicto* should not be applied in cases where the near relation, upon whom the express or implied threats of prosecution, whether lawful or unlawful, had been used, had been unwell or nervous at the time of entering into the contract, and sufficient time had not been afforded to obtain disinterested advice.

We have quoted so fully from this case for the reason that many of the questions disposed of there are very similar to the ones that could be raised here, and the full citation of authorities renders unnecessary a repetition and review of them here.

The firm's notes were returned in January by the attorney for the appellees to the appellants, together with a letter, in which it was stated, that the appellees would refuse payment of the note for $529. On January 22nd, both of the appellants, accompanied by their attorney, went to the home of the appellees, and it is claimed that at the interview held then, the appellees ratified their contract. Without going into the details of that interview, we are satisfied, from the testimon, that there was no ratification.

We are, therefore, of the opinion that the note, given under the circumstances as they appear from this record, was not the voluntary act of the appellees, and that they should be relieved from responsibility for it.

*Decree affirmed, with costs to the appellees.*