# FOOD FAIR STORES, INC. *v.* TERESA CAROL JOY

[Misc. No. 8, September Term, 1977.]

*Decided July 17, 1978.*

206

The cause was argued before Murphy, C. J., and Smith, Digges, Levine, Eldridge, Orth and Cole, JJ.

*Gerson B. Mehlman,* with whom were *George D. Solter* and *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellant.

*R. Douglas Jones,* with whom were *Joseph I. Huesman* and *Lerch & Huesman* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court. COLE, J., dissents and filed a dissenting opinion at page 220 *infra*.

Pursuant to Maryland Code (1974), § 12-601 of the Courts and Judicial Proceedings Article, the United States District Court for the District of Maryland has certified two questions for resolution by this Court: First, whether a release in which a defendant accused of committing the crime of shoplifting has discharged the complaining party from all civil liability is void as a matter of public policy because it was executed in consideration of a nolle prosequi entered by the State's Attorney. Secondly, if such a release is not void as against public policy, do the circumstances under which it was executed constitute duress as a matter of law? We hold that under the facts of this case, the release was neither in contravention of public policy nor the product of duress.

The episode which spawned this dispute occurred on August 4, 1975, when a security guard employed by appellant at its supermarket in Glen Burnie arrested appellee who was then shopping for groceries in the company of her two little girls. According to the employee, he had observed appellee place a package of luncheon meat in her shoulder bag before proceeding through the checkout line and then leave the store without paying for the item. He further stated that on being confronted, appellee returned to the interior of the store, removed the package from her purse and placed it on a shelf. She allegedly offered to pay for the merchandise, valued at $2.49, after the special police officer placed her under arrest. At all times appellee denied committing the offense, claiming instead that she had returned the package of meat to a shelf in the canned vegetable aisle after deciding not to buy it, and only then moved toward the checkout line. She subsequently reentered the store at the request of the officer solely for the purpose of returning the merchandise to its proper location in the meat cooler, but was placed under arrest before she could do so.[1]

---

1. Appellee's version of the events leading to her arrest are contained in an affidavit filed by her in the federal court and which now constitutes an appendix to her brief in this Court. Because the affidavit was filed belatedly

After being detained at the store, appellee was taken to Anne Arundel County police headquarters at Millersville, where she was formally charged with the crime of shoplifting. She then retained counsel who informed the prosecuting attorney of her willingness to submit to a polygraph test with the understanding that the results would be offered without objection at the criminal trial. With the agreement of the prosecutor, the Maryland State Police administered such a test, the outcome of which, according to appellee's then counsel, was consistent with her claim of innocence. Subsequently, the prosecutor apparently refused to stipulate to the admissibility of the test, but instead wrote to defense counsel in January 1976 that he would dismiss the charge if a "civil release were to be given to the Complainants." Alternatively, he offered to enter a dismissal even without such a release on the condition that he receive a written statement from appellant indicating that it did not object to that action being taken. Defense counsel forwarded the offer of the State's Attorney to appellant, but received no response to his request for the statement suggested by the prosecutor.

On May 25, 1976, the date on which the criminal case was to be tried, appellee executed the release in question and the State's Attorney entered the nolle prosequi in open court. Several weeks later, appellee brought a diversity action against appellant in the federal court, seeking damages for false imprisonment, malicious prosecution and slander. Appellant responded with a motion for summary judgment founded upon the release executed by appellee. The resulting dispute as to the validity of the release eventuated in this certification proceeding.

---

in the federal court and was therefore not included in the record forwarded to us, we granted appellant's motion to strike the appendix. We have nevertheless drawn upon the contents of the affidavit to a limited degree, not because we have now concluded that appellee was justified in submitting it as an appendix, but because it does complete the conflicting accounts of the incident that were undoubtedly available to the prosecutor when he made his decision to enter the nolle prosequi. In light of the result reached here, our limited reference to the contents of the affidavit hardly serves to prejudice appellant's case.

## (1)

We recognize at the outset that virtually all agreements by a prosecuting attorney to enter a nolle prosequi in a criminal case are affected by considerations of public policy. This is particularly the case where it appears that such action is taken by the prosecutor as part of a bargain that has the effect of resulting in a private gain. The rule traditionally followed in this country is that bargains which tend to stifle criminal prosecution, whether by suppressing investigation of crime or by deterring citizens from their public duty to assist in the detection or punishment of crime, are void as against public policy. 14 S. Williston, *A Treatise on the Law of Contracts* § 1718 (3d ed. 1972); 6A A. Corbin, *Contracts* § 1421 (1962). Since public policy dictates that violations of the criminal laws be duly prosecuted, agreements to refrain from instituting criminal prosecutions are deemed inimical to the impartial administration of justice.[2]

The foregoing principles were recognized long ago by this Court in *Wildey v. Collier,* 7 Md. 273, 61 Am. Dec. 346 (1854). There a mortgage was given as security for five promissory notes which were delivered as partial consideration for a promise by the mortgagee-payee to procure from the governor a nolle prosequi of an indictment pending against the maker of the notes. In affirming a decree sustaining exceptions to the ratification of a sale under the mortgage, the Court held that the agreement to seek the nolle prosequi contravened public policy, not because the agreement to obtain executive clemency was itself illegal, but because of the possibility that the governor might have been "induced to act upon considerations suggested by a *party having an*

---

2. This same public policy is embodied in the related common law crimes of obstructing justice and compounding an offense. Not only was obstruction of justice an indictable offense at common law, Garland v. State, 112 Md. 83, 90, 75 A. 631 (1910), but in Maryland it is also subject to prosecution and punishment by statute. Maryland Code (1957, 1976 Repl. Vol.) Art. 27, § 27; Romans v. State, 178 Md. 588, 591-92, 16 A. 2d 642 (1940), *cert. denied,* 312 U. S. 695 (1941). For a general discussion of the public policy doctrine as applied to the law of contracts, see Maryland-National Capital Park and Planning Commission et al. v. Washington National Arena, 282 Md. 588, 604-07, 386 A. 2d 1216 (1978).

*interest* to produce false impressions on his mind." 7 Md. at 279 (emphasis added).

Similarly in *Schirm v. Wieman,* 103 Md. 541, 545, 63 A. 1056, 7 L.R.A. (N.S.) 175 (1906), holding that a contract entered into by the victim of a theft for the return of his stolen property did not offend public policy, we nevertheless reaffirmed our adherence to the venerable rule:

> "[I]t is of public interest and in accordance with public policy that the laws for the protection of property shall be effective, in order that the offenders may be promptly apprehended and convicted. Therefore all proposed agreements made with the thief or with anyone, by which the apprehension of the criminal, his trial or conviction may be prevented or obstructed, are contrary to public policy and absolutely void."

Inasmuch as the release in dispute here was executed in reliance upon the State's Attorney's promise to enter a nolle prosequi on the shoplifting charge, an argument might be made that the public policy against contracts which obstruct criminal prosecutions ought to bar enforcement of the compromise agreement in the present case. In our opinion, however, the general rule does not govern the outcome of this case for reasons that follow.

No reported decision in Maryland or elsewhere has come to our attention in which an agreement for the entry of a nolle prosequi under circumstances similar to those present here has been challenged on grounds of public policy. This case, for example, is unlike those in which an agreement has been struck down where a private party—typically the civilian complainant—has agreed to refrain from initiating or pressing criminal charges. In *Wilson v. United States Lines,* 114 N.J. Super. 175, 275 A. 2d 457, 459 (1971), where the complainant and a criminal defendant charged with theft agreed that the prosecution would be discontinued in return for restitution of the stolen property and a general release of all civil claims, the court held that the release did not bar recovery for malicious prosecution, applying the general rule

that "an agreement to forbear prosecution of a criminal case is void as against public policy." *See Baker v. Citizens Bank of Guntersville,* 282 Ala. 33, 208 So. 2d 601, 606 (1968); *Bowyer v. Burgess,* 54 Cal. 2d 97, 4 Cal. Rptr. 521, 351 P. 2d 793, 794 (1960); *Hazen v. Rich's, Inc.,* 137 Ga. App. 258, 223 S.E.2d 290, 293 (1976); *Murphy v. Rochford,* 55 Ill. App. 3d 695, 13 Ill. Dec. 543, 371 N.E.2d 260, 264 (1977); *Groening v. Nowlen,* 369 Mich. 28, 118 N.W.2d 998, 1001 (1963). In each of these cases the victim himself attempted "to wrest the criminal proceedings, open to him, from their proper purpose, and make use of them as a means of coercing the defendant" into an agreement. *Portner v. Kirschner,* 169 Pa. 472, 32 A. 442, 443 (1895).

In the instant case, however, we are faced with an agreement between the criminal defendant and the prosecuting attorney, who, having correctly determined that there was probable cause for bringing the charge, elected in good faith to exercise his discretion by entering a nolle prosequi in exchange for the defendant's release of the complainant from all civil liability. Particularly significant in this respect is the absence of any evidence that appellant participated in the decision, directly or indirectly. On the contrary, the record reflects only that the State's Attorney acted for himself in conducting the negotiations with counsel for appellee.[3]

Clearly, then, this is not a case where an alleged victim of a crime attempts to apply the leverage of a criminal prosecution—supported by probable cause or not—to his own advantage, either by extracting some form of compensation from the accused or by securing a release from civil liability. Thus, the very purpose which lies at the core of the public policy rule—to prevent perversion of the

---

3. Appellee argues here that the expressed willingness of the State's Attorney to enter the nolle prosequi without execution of a civil release, if appellant would not object, constituted a delegation of prosecutorial authority and thus made appellant a party to the agreement. The fact is, however, that appellant neither vetoed nor accepted the arrangement between the State's Attorney and appellee; it simply never communicated with either of the parties. Had it done so, we might conceivably have been faced with an altogether different case.

administration of justice—would in no way be furthered by nullifying the release in question here.

Furthermore, since it was the State's Attorney himself who entered into the agreement with the accused, this case is distinguishable from those decisions involving agreements to influence or solicit public officials. *E.g., Wildey v. Collier, supra,* 7 Md. 273; *Tremont Trust Co. v. Brand,* 244 Mass. 421, 138 N. E. 564, 566 (1923); *Buck v. First Nat. Bank of Paw Paw,* 27 Mich. 293, 302-303, 15 Am. Rep. 189 (1873). This case is also unlike those in which entry of the nolle prosequi was conditioned upon a civil release of a police officer or the state itself. *E.g., Boyd v. Adams,* 513 F. 2d 83 (7th Cir. 1975); *MacDonald v. Musick,* 425 F. 2d 373 (9th Cir.), *cert. denied,* 400 U. S. 852 (1970); *Gray v. City of Galesburg,* 71 Mich. App. 161, 247 N.W.2d 338 (1976). *But cf. Leonard v. City of Los Angeles,* 31 Cal. App.3d 473, 107 Cal. Rptr. 378, 381 (1973) (stipulation by defendant before dismissal of criminal case that probable cause existed available as defense in civil action against city since court entered dismissal). Compelling reasons of public policy exist for denying validity to such agreements. "[A] desire on the part of the prosecuting authority to extract police officers from possible liability offers an undeniable temptation to concoct or exaggerate the charges against the defendant to enhance his bargaining position." *Gray v. City of Galesburg,* 247 N.W.2d at 340; *see Dixon v. District of Columbia,* 394 F. 2d 966, 969 (D.C. Cir. 1968) ("these agreements suppress complaints against police misconduct which should be thoroughly aired in a free society").[3a]

---

**3a.** In support of its position, the dissent relies almost exclusively on the three "police cases" cited in the text accompanying this footnote. It matters not, in the dissent's view, that the beneficiaries of the bargained-for releases in each of those cases were police officers as opposed to private complainants. Thus, the dissent has unfortunately failed to perceive a most crucial distinction between these cases and the matter at hand.

A police officer and a prosecuting attorney are both agents of the state. It is precisely this commonality of interest which casts a taint of illegality upon any agreement with an accused by which one state agent, the prosecutor, seeks to bestow a benefit upon another state agent, the police officer, in the form of a release of the latter from civil liability for torts allegedly committed against the accused. In such cases there is an extraordinarily high probability that the prosecutor's decision not to proceed to trial will be motivated by improper considerations.

None of the objectives served by the above public policy principles is present here. Appellee makes no contention that the State's Attorney was actuated by a desire to protect a fellow law enforcement officer from civil liability or that he relied on contrived charges for the purpose of coercing execution of the release.

Critical to the distinction between agreements which are made at the instance of a complaining witness and those, like the release in this case, which are initiated by a prosecuting attorney, is the broad discretionary role played in Maryland by the State's Attorney, whose powers are nowhere specifically enumerated or defined. *Murphy v. Yates,* 276 Md. 475, 489, 495, 348 A. 2d 837 (1975). Maryland Code (1957, 1976 Repl. Vol., 1977 Cum. Supp.) Art. 10, § 34, the only statute which purports to delimit the authority of the State's Attorney, merely provides that he "shall . . . prosecute and defend, on the part of the State, all cases in which the State may be interested." Thus this Court has said:

> "In such prosecutions of persons accused of crime, [the State's Attorney] must exercise a sound discretion to distinguish between the guilty and the innocent. He must be trusted with broad official discretion to institute and prosecute criminal causes, subject generally to judicial control. The office is one not purely ministerial, but involves the exercise of learning and discretion. . . . As a general rule, whether the State's Attorney does or does not institute a particular prosecution is a matter which rests in his discretion." *Brack v. Wells,* 184 Md. 86, 90, 40 A. 2d 319 (1944) (citation omitted).

*Accord, State's Atty v. City of Balto.,* 274 Md. 597, 608-609, 337 A. 2d 92 (1975). *But cf. Sinclair v. State,* 278 Md. 243, 254,

---

Patently, there is no such risk of abuse of prosecutorial power in the present case. The record is absolutely devoid of even a trace of evidence tending to support an inference of collusion between the State's Attorney and appellant. To the contrary, the prosecutor appears to have acted in the utmost good faith and out of genuine concern for appellee. In short, the fatal identity of interest which quite correctly brought about invalidation of the release agreements in the "police cases" is totally absent here.

260, 363 A. 2d 468 (1976) (prosecuting attorney with pecuniary interest in related civil matter, impairing obligation to act impartially, disqualified by public policy from initiating or participating in prosecution; decision to prosecute "must be in accord with the fair and impartial administration of justice, untainted by any contaminating influence").

Embraced within the broad discretion vested in the State's Attorney is the decision whether or not to enter a nolle prosequi in a criminal case. *Brady v. State,* 36 Md. App. 283, 290, 374 A. 2d 613 (1977); *State v. Hunter,* 10 Md. App. 300, 304, 270 A. 2d 343 (1970), *remanded,* 263 Md. 17, 278 A. 2d 608 (1971); *see Exxon Corp. v. Kelly,* 281 Md. 689, 694-95, 381 A. 2d 1146 (1978). From a procedural standpoint, former Maryland Rule 711, which was in effect when the prosecution was terminated here by the State's Attorney, mandated only that the nolle prosequi be entered in open court, a requirement which was met in this instance.[4] Given the discretionary power which the State's Attorney has in deciding whether a nolle prosequi should be entered, it follows that he may attach reasonable conditions in agreeing to such a disposition, *Williams v. State,* 7 Md. App. 241, 245, 254 A. 2d 376 (1969), *cert. denied,* 256 Md. 749 (1970); *cf. State v. Morgan,* 33 Md. 44, 46-47 (1870) (entry of nolle prosequi conditioned upon payment of costs of indictment), provided, of course, that the conditions imposed in no event violate the Constitution, statutes or public policy of this state.

In his affidavit contained in the record before us, the State's Attorney, after succinctly noting the observations made by the store detective, furnished two reasons for agreeing to appellee's request that a nolle prosequi be entered: "Because of the very insignificant value of the item alleged to have been shoplifted and assurance that the Defendant had no prior criminal record." In conditioning his action upon a release of appellant from any potential civil action, he was observing his "established policy" in cases where, as here, there was sufficient probable cause for the issuance of the original

---

4. Effective July 1, 1977, former Rule 711 was supplanted by Rule 782, which now requires that the State's Attorney also include within the record of the criminal case a statement of reasons for entering the nolle prosequi.

charging document.[5] Since he was exercising his prosecutorial discretion, he considered it his "obligation to protect and insulate [appellant] for [sic] bogus law suits," particularly since the complainant was without redress to question his authority to nolle prosse. Had he determined, he continued, "that there was insufficient probable cause for the issuance of the charge, [he] would have authorized the nolle prosse but not have requested the release," since he regarded himself under no obligation to protect a complainant who has in fact brought charges unsupported by probable cause.

Although public policy dictates that the State's Attorney duly prosecute violations of the criminal law, *Schirm v. Wieman, supra,* 103 Md. at 545, he is nevertheless bound to recognize, in exercising his prosecutorial discretion, that in our present day society no prosecutor can meet his responsibilities to the public without the cooperation and support of private citizens. Accordingly, it is in the public interest that legitimate victims of crime report such offenses freely and not be discouraged from doing so by an understandable concern that the State's Attorney might, by deciding to refrain from prosecuting, subject complainants to civil liability. It would seem that this responsibility is owed the authentic victim of crime no matter how well-intentioned the prosecutor might have been in arriving at his decision to drop the criminal charges.

Conversely, the State's Attorney should be free to consider the plight of the first time offender in minor criminal cases

---

5. Even given appellee's own favorable version of the critical events immediately preceding her arrest, the State's Attorney was clearly in possession of probable cause if he chose to accept the store detective's account. Absent any reason why he should not have done so, such as an indication that the complaining witness's credibility was in doubt, a prosecutor would certainly not have been unjustified in accepting his statement as the basis for his official actions. Were he to pursue any other policy, it is doubtful that many prosecutions would survive the initial determination which a State's Attorney must make in virtually every case.

We note that in relevant part, Article 27, § 551A, pursuant to which appellee was charged here, makes it a crime: "(1) To remove any goods, wares or merchandise from the immediate place of display or from any other place within the establishment with the intent to appropriate the same to the use of the person so taking, or to deprive the owner of the use, or value, or any part thereof." The account of the incident furnished by the store detective, if accepted by the trier of fact in a criminal case, clearly would have supported a conviction of shoplifting under the statute.

without fear of subjecting the innocent victim to a civil suit for damages. If the prosecutor is prompted by humanitarian considerations to relieve a defendant of even the mere stigma of prosecution in circumstances such as existed here, it is in the public interest that he be free to do so; and that he not be shackled by the chilling prospect that the victim will be sued. "[A] promise not to prosecute is not illegal 'where it is made, not for the sake of gain, but from motives of kindness and compassion . . . .' " *O'Neil v. Dux*, 257 Minn. 383, 101 N.W.2d 588, 593 (1960). To hold that a civil release executed in this context is unenforceable as a matter of public policy would be to place an unwarranted constraint upon the prosecutor, who might for wholly justifiable reasons, despite the existence of probable cause for a criminal prosecution, wish to extend a compassionate hand to a first time offender.

Since the arguments advanced by appellee against implementation of the disputed compromise arrangement do not "clearly and unequivocally outweigh" the important considerations militating in favor of enforcement, we hold that under the facts of this case, the release from civil liability executed by appellee was not void as a matter of public policy. *Maryland-National Capital Park and Planning Commission et al. v. Washington National Arena*, 282 Md. 588, 607, 386 A. 2d 1216 (1978).

### (2)

Appellee urges us to hold that the release was executed under such circumstances as to constitute duress as a matter of law. We do not agree. An early test applied by this Court to determine whether a written instrument had been signed under duress was whether execution of the document had been "induced by harshness and threats, and the exercise of an unwarrantable authority, so excessive as to subjugate and control the freedom of [the signatory's] will." *Central Bank v. Copeland*, 18 Md. 305, 319, 81 Am. Dec. 597 (1862); *accord, Spoerer v. Wehland*, 130 Md. 226, 230, 100 A. 287 (1917); *see Rockville v. Brookeville*, 246 Md. 117, 133-34, 228 A. 2d 263

(1967). Similarly, the Restatement of Contracts § 492 (1932) defines "duress" in these terms:

> "(a) [A]ny wrongful act of one person that compels a manifestation of apparent assent by another to a transaction without his volition, or
>
> "(b) [A]ny wrongful threat of one person by words or other conduct that induces another to enter into a transaction under the influence of such fear as precludes him from exercising free will and judgment, if the threat was intended or should reasonably have been expected to operate as an inducement."

Thus, under this test, duress is essentially composed of two elements:

> "(1) A wrongful act or threat by the opposite party to the transaction or by a third party of which the opposite party is aware and takes advantage, and (2) a state of mind in which the complaining party was overwhelmed by fear and precluded from using free will or judgment." *Plechner v. Widener College, Inc.,* 418 F. Supp. 1282, 1294 (E.D. Pa. 1976); *see generally* D. Dobbs, *Handbook on the Law of Remedies* § 10.2 (1973).

With respect to the first element, the acts or threats must be wrongful. Restatement of Contracts § 492, Comment g. An act, whether it be performed or threatened, may be wrongful even though not unlawful. *Eckstein v. Eckstein,* 38 Md. App. 506, 515, 379 A. 2d 757 (1978); *Bell v. Bell,* 38 Md. App. 10, 17, 379 A. 2d 419 (1977). Means in themselves lawful, however, must be so oppressively used as to constitute an abuse of legal remedies. *McBride v. Atlantic City,* 146. N.J. Super. 498, 370 A. 2d 69, 71 (1974), *aff'd per curiam,* 146 N.J. Super. 406, 370 A. 2d 20 (1975), *aff'd,* 72 N. J. 201, 370 A. 2d 1 (1976) (offer to drop criminal charges against police officer in return for resignation). A threat to institute criminal proceedings becomes wrongful within the meaning of this rule "if made with the corrupt intent to coerce a transaction

grossly unfair to the victim and not related to the subject of such proceedings. . . ." *Link v. Link,* 278 N. C. 181, 179 S.E.2d 697, 705 (1971) (citations omitted).

Courts, however, have traditionally placed less emphasis on the wrongfulness element than on the effect of the wrongful act or threat upon the person claiming to have been thereby coerced. "[T]he controlling factor is the condition, at the time, of the mind of the person subjected to the alleged coercive measures, rather than the means by which the given state of mind was induced, and thus the test is essentially subjective." *McBride v. Atlantic City,* 370 A. 2d at 71. The decisive question in this regard is whether the person claiming duress entered the particular transaction in such fear as to preclude his exercise of free will and judgment. Restatement of Contracts § 472, Comment a (1932).

Under the most recent formulation of the American Law Institute, however, there has been a marked shift in emphasis from the subjective effect of a threat to the nature of the threat itself.[6] The earlier requirement that the threat arouse such fear as to preclude an exercise of "free will and judgment" has been omitted "because of its vagueness and impracticability." Restatement (Second) of Contracts § 317, Comment b (Tent. Draft No. 12, 1977). Manifestly, application here of the test now advocated by the Institute would serve only to attenuate appellee's claim of duress.

Regardless of which definition is applied, none of the elements constituting duress is established as a matter of law on the record before us. Clearly there was nothing in the institution of the criminal prosecution itself that would be suggestive of unlawful or even wrongful conduct. Given the

---

**6.** Restatement (Second) of Contracts §§ 316-17 (Tent. Draft No. 12, 1977) now defines duress in this manner:

"§ 316 Where conduct that appears to be a manifestation of assent by a party who does not intend to engage in that conduct is *physically compelled* by duress, the conduct is not effective as a manifestation of assent.

"§ 317

"(1) . . . [W]here a party's manifestation of assent is induced by an *improper threat* that leaves him *no reasonable alternative,* the contract is voidable by that party." (emphasis added).

existence of probable cause, the State's Attorney was merely complying with his statutory mandate. Nor does the record here reflect any conduct on his part in the manner in which he communicated the offer to appellee's attorney that would establish duress as a matter of law. Missing here are those efforts to exploit or oppress — or to misuse the power of the prosecutor's office — which normally characterize this species of duress. Probable cause being present, a mere offer by a prosecutor to enter a nolle prosequi of a pending criminal case conditioned upon a release of the complainant from civil liability simply cannot be equated with a threat, improper or not, of prosecution or imprisonment.

Furthermore, whatever the effect of this unfortunate experience on appellee, we cannot say as a matter of law on this record that the not unjustifiable fear of a possible conviction, whether prompted by the prosecutor's actions or not, left her in such a state of mind as to preclude the exercise of her free will or judgment in signing the release. A fact which cannot be ignored in this regard is the lapse of almost four months between the day the State's Attorney first disclosed his offer to enter a nolle prosequi in return for the civil release and appellee's appearance in court—the occasion on which she finally signed the compromise agreement.

We hold only, then, that the release was not the product of duress as a matter of law.

> *Questions of law answered as herein set forth; costs to be paid by appellee.*

---

7. Under Maryland Code (1974), § 12-601 of the Courts and Judicial Proceedings Article, it is our function to answer "questions of law certified" to this Court. Contrary to the impression created by the dissent, therefore, we do not evaluate or weigh the evidence, but instead accept the statement of facts submitted by the certifying court. To "wonder," for example, "why the polygraph evidence did not cause the State's Attorney to reconsider the advisability of pursuing a prosecution or why, indeed, he denied the defendant the use of this evidence knowing full well the stimulus such denial would have in persuading a defendant to execute a release," 283 Md. at 228, would appear to exceed our statutorily prescribed role.

*Cole, J., dissenting:*

I do not agree with the majority's answers to the two questions certified to this Court by the United States District Court for the District of Maryland. I, therefore, respectfully dissent.

I

The majority concedes that as a general rule agreements that stifle criminal prosecutions are void as against public policy because they tend to pervert the administration of justice. *See Schirm v. Wieman,* 103 Md. 541, 63 A. 1056, 5 L.R.A. (N.S.) 175 (1906) and *Wildey v. Collier,* 7 Md. 273, 61 Am. Dec. 346 (1854). However, the majority holds that on the facts of this case an exception to the rule must be made. It premises this exception on the ground that here the State's Attorney (acting for himself) was dealing directly with the defendant and that at no time was the prosecuting witness a party to the negotiations not to prosecute in return for the release from civil liability. Thus, they claim this case is distinguishable because the victim is not applying leverage of a criminal prosecution to its own advantage either to extract compensation from the defendant or by securing a release from civil liability.

I ask the questions: Of what advantage is it to the State's Attorney that the defendant release Food Fair? What better and more persuasive agent could Food Fair have than the State's Attorney to procure a release? Why should Food Fair, a powerful corporation with batteries of lawyers, negotiate with the defendant contrary to the law? One is required to be completely naive to accept the proposition that Food Fair was oblivious to the status and progress of this criminal proceeding. The majority, however, says the State's Attorney, whose powers are nowhere specifically defined, has wide discretion to decide whether or not to enter a nolle prosequi in a criminal case limited only by what is in accord with the fair and impartial administration of justice, untainted by any contaminating influence. The reasons given in this case for entering the nolle prosequi were that the item allegedly stolen

was of little value and the defendant had no prior record. The majority indicates acceptance of the prosecutor's further explanation that since Food Fair could not challenge his authority to nolle prosse, and since there was probable cause for the criminal action, he exercised his prosecutorial discretion to protect Food Fair from being sued. I respectfully submit that the State's Attorney's duty is to prosecute and defend on behalf of the State and he is without authority to compromise a defendant's civil rights under these circumstances. Such an exercise of his powers is void as against public policy.

Although there is no Maryland decision directly on point, three decisions from other jurisdictions support this position; no reported decision in Maryland or elsewhere has come to my attention which refutes it.

In *MacDonald v. Musick,* 425 F. 2d 373 (9th Cir.), *cert. denied,* 400 U. S. 852 (1970), the defendant had been arrested for driving while intoxicated. At trial the prosecution moved to dismiss the case but when the defendant declined to stipulate that there was probable cause to arrest, the prosecutor withdrew his motion and filed an amended complaint adding a second charge. Subsequently, the defendant was acquitted on the first charge and convicted on the second. The prosecutor admitted that the motion to dismiss was withdrawn because the defendant would not relinquish his potential civil claim. The court said:

> It is no part of the proper duty of a prosecutor to use a criminal prosecution to forestall a civil proceeding by the defendant against policemen, even where the civil case arises from the events that are also the basis for the criminal charge. We do not mean that the prosecutor cannot present such a criminal charge. What he cannot do is condition a voluntary dismissal of a charge upon a stipulation by the defendant that is designed to forestall the latter's civil case. [425 F. 2d 373 at 375].

Similarly, in *Boyd v. Adams,* 513 F. 2d 83 (7th Cir. 1975), another case which challenged a public prosecutor's dismissal

of criminal charges conditioned on the defendant's execution of a civil release, the court found the release invalid and the prosecutor's exercise of such a practice subject to injunctive relief:

> 'In sum, we find these release agreements odious and distasteful, to be enforced only in very rare circumstances. Among other requirements, there must be a knowing and intelligent waiver by the signer of the right to pursue further actions at law, and the person[s] released from liability have the burden of proving by clear and convincing proof, that no coercion or duress of any sort was exerted upon the signer.' [513 F. 2d 83 at 88].

Of particular interest is the memorandum by the Chief of the Criminal Division issued to Assistant State's Attorneys, *Boyd, supra,* footnote 6, page 89:

> An Assistant State's Attorney is not permitted to condition his official action in a criminal case as contingent upon the action of any person in a civil proceeding (e.g. a nolle in return for a release of a civil liability). Your official action must be based only upon the merits of the criminal case before you. To do otherwise could violate Chapter 38, Section 32-1, Illinois Revised Statutes (Compromising a Crime) and would be of doubtful validity.

The majority contends that these cases are distinguishable merely because "the entry of the nolle prosequi was conditioned upon a civil release of a police officer or the state itself." However, *Gray v. City of Galesburg,* 71 Mich. App. 161, 247 N.W.2d 338 (1976) makes it clear, if *MacDonald, supra* and *Boyd, supra* do not, that a release of police officers from civil liability—given in exchange for the dismissal of criminal charges—is void as against public policy on two separate grounds: (1) the public interest in prosecution is wrongly exchanged for the private interest of release from civil liability; (2) agreements of this kind involving police officers tend to suppress complaints against the police which should be publicly aired.

The emphasis in *Gray, supra* was on the fact that police officers are *private* individuals. Their release from liability was void, in the first instance. As the *Gray* court expressed it:

> The contract for release, if viewed in this light, becomes a trade-off of a public interest for a private interest. We recognize that there may be an indirect public interest in protecting the city's employees from civil liability incurred while in the city's employ. **The city will naturally want to support its officers** to insure that able men will be attracted to, and remain with, the police force. However, if the officers' conduct was tortious, the public has no interest in denying their victims redress. If, on the **other hand, the officers acted legally, they are** afforded the full protection of the law and need not resort to the release for vindication. [247 N.W.2d 338 at 340].

*Gray, supra* went further and stated an additional ground for denying validity to such agreements—that grievances against police officers should be publicly aired because "a desire on the part of the prosecuting authority to extract police officers from possible liability offers an undeniable temptation to concoct or exaggerate the charges against the defendant to enhance his bargaining position." 247 N.W.2d 338 at 340.

Agreements like the one in the present case are repugnant to public policy because they tend to deprive the public of their right to vigorous enforcement of the laws for the predominant purpose of benefiting *individual* persons. The majority opinion acknowledges that this bargain has resulted in a gain to Food Fair, but choosing to disregard the foregoing cases, comes to the conclusion that because we deal here with an agreement between a criminal defendant and the prosecuting attorney public policy is not contravened. This position is buttressed with the assumption that the State's Attorney acted in good faith while exercising his official duty and the evidence that Food Fair did not participate in the decision of the State's Attorney.

Notwithstanding the fact that no actual wrong or thought of wrong need be imputed to the parties of such an agreement for it to be void as against public policy, the record here raises a serious suspicion of bad faith on the part of the State's Attorney. Furthermore, while there is no showing that Food Fair participated in the State's Attorney's decision to nolle prosse, it is clear that the most advantageous tack for Food Fair to take was to allow the State's Attorney "to mind the store."

The problem with allowing the prosecutor to bargain for a civil release in a criminal case is that it raises the suspicion that the decision to prosecute has been tainted. Unlike the plea bargain situation, which finds its justification in the fact that it is created in the public interest—and is generally subject to court approval—a bargain for a civil release in a criminal case can only be justified if it is: (1) *within* the purview of the State's Attorney's authority and (2) entered into in good faith.

While I recognize the broad discretionary powers the State's Attorney has with respect to the entry of a nolle prosequi, *State v. Hunter,* 10 Md. App. 300, 304, 270 A. 2d 343 (1970), remanded, 263 Md. 17 (1971), I hasten to point out that the State's Attorney's discretion to institute and prosecute criminal causes is "subject generally to judicial control," *Brack v. Wells,* 184 Md. 86, 90, 40 A. 2d 319 (1944), and such control should be reflected by our decision in this case. The proper conduct of a State's Attorney is stated in the dissenting opinion of Judge Davidson in *Sinclair v. State,* 27 Md. App. 207, 222-224, 340 A. 2d 359 (1975), reversed 278 Md. 243, 363 A. 2d 468 (1976):

> The standards by which to appraise the conduct of a State's Attorney are established by Maryland law (footnote omitted). It is the duty of the prosecutor, as of every lawyer, to represent a client zealously within the bounds of the law. ABA, Code, Canon 7, Ethical Consideration 7-1. Because the power of the prosecutor to institute criminal prosecutions vests in him an authority in the administration of criminal

justice at least as sweeping as, and perhaps greater than, the authority of the judge who presides in criminal cases (citation omitted), the responsibility of a public prosecutor differs from that of the usual advocate. His duty is to seek justice, not merely to convict. *Powell v. State,* 16 Md. App. 684, 694-95, n. 1, 299 A. 2d 454, 459 n. 1 (1973) (subsequent citations omitted). His obligation is to protect not only the public interest but the innocent as well and to safeguard the rights guaranteed to all persons, including those who may be guilty.

\* \* \*

Because a prosecutor represents the State, he must, as must a judge, not only be disinterested and impartial in the performance of his duties but also appear to be so (footnote omitted) (citations omitted). In order to assure fair and equal treatment to all, a prosecutor must use restraint in the discretionary exercise of governmental powers, such as in the selection of cases to prosecute. ABA, Code, Ethical Consideration 7-13 (subsequent citations omitted). He, like a government attorney who possesses discretionary powers relative to civil litigation, should not use his position, or the economic power of the government, to harass parties or to bring about unjust settlements or results. *See* ABA, Code, Ethical Consideration 7-14. *Finally, like all lawyers, he is forbidden to present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter.* ABA, Code, Disciplinary Rule 7-105; *see State v. Detroit Motors,* 163 A. 2d 227, 230-31 (N.J. Super. 1960). (Emphasis supplied)

These same ethical considerations were relied upon in *MacDonald, supra,* 425 F. 2d 373 at 376 to void the prosecutor's agreement to nolle prosse in exchange for a civil release. Particularly significant is the *MacDonald* court's

recital of ABA, Code, Disciplinary Rule 7-105 and the comment that public prosecutors, like all other lawyers, are bound by the rule. 425 F. 2d 373 at 376. I submit that State's Attorneys in Maryland also should be bound by the ABA Code of Professional Responsibility, and that absent a clear legislative intent to authorize State's Attorneys to enter these agreements they should be barred from doing so by the general public policy rule against such agreements.

In the present case the State's Attorney had a duty to decide whether or not to nolle prosse without considering the defendant's possible course of conduct with respect to a future civil claim. I would adhere to the principle that "when a state's attorney determines that the public interest requires prosecution, it is his duty to zealously seek to convict those guilty of crime." The majority's concern for the public interest in encouraging the legitimate victims of crime to freely report such offenses is commendable. On the other hand, however, the State's Attorney should not be in a position to shield the alleged victim of crime from civil liability for conduct which may have been tortious. Certainly the public has no interest in denying redress to innocent individuals who have been wrongly accused of crime. My answer to the first question would be that it is against public policy for the State's Attorney to require release in return for a nolle prosse.

## II

The second question: "If such a release is not void as against public policy, do the circumstances under which it was executed constitute duress as a matter of law?" should be answered in the affirmative.

Two factors stand out as determinative of this question: first, time from arrest to prosecution and second, the failure of the State's Attorney to keep his word regarding the admissibility of the results of the polygraph tests. The defendant protested her innocence from the outset and expressed her willingness to go to any lengths to prove she was telling the truth. On August 4, 1975, when approached

by the security guard on the parking lot, she denied stealing the package of meat and told the guard she had placed it on a shelf in another aisle. She took him to the aisle and produced the package. The whole thrust of her defense was that the guard was lying when he said she took it out of her pocketbook and put it on the shelf.

She offered to submit to a polygraph test and pay the costs but the State's Attorney demanded that the Maryland State Police conduct the examination. When the judge in District Court on January 9, 1976, refused to postpone the case so she could take the polygraph test, she prayed a jury trial so that the test or examination could be conducted. Not only did she take one test but two tests and in each the result indicated that she was truthful. However, the State's Attorney reneged on his agreement and told her he would not agree to have the results admitted into evidence. Despite the defendant's attorney's effort, the State's Attorney refused to keep the bargain. Thus, on May 25, 1976, nine months after her arrest, the morning of trial in the Circuit Court, the defendant was forced to sign the release *rather* than subject herself to possible conviction and punishment.

**Is there any question that the State's Attorney demonstrated bad faith in reneging on his promise to admit** the polygraph results? It seems clear that this evidence would have been damaging to the State's case on trial and would have substantiated defendant's assertion of her innocence. Contrary to the majority claim that "missing here are those efforts to exploit or oppress . . . or to misuse the power of the **prosecutor's office . . . which normally characterize this** species of duress," the State's Attorney stripped the defendant of exculpatory evidence and then used the threat of prosecution to extract a civil release. The defendant, a mother of two children, never having been arrested before, having the pressure of criminal prosecution hanging over her for nine months, was coerced into executing the release.

The majority is satisfied that, "[g]iven the existence of probable cause, the State's Attorney was merely complying with his statutory mandate" in going forward with the prosecution. Nevertheless, while it is apparent from the

228

record that probable cause existed at the time of arrest, one is left to wonder why the polygraph evidence did not cause the State's Attorney to reconsider the advisability of pursuing a prosecution or why, indeed, he denied the defendant the use of this evidence knowing full well the stimulus such denial would have in persuading a defendant to execute a release.

What the State's Attorney did was inherently coercive and amounted to duress as a matter of law.